Cowen, Chief Judge,
delivered the opinion of the court:
This is an action for the recovery of income taxes paid by the taxpayers for the tax years 1951 and 1958. During those years, each plaintiff (or his or her spouse) was a stockholder of Wemberly Gardens Corporation (hereinafter referred to as Wemberly Gardens), a New York corporation.
The sole issue presented in this suit is whether Wemberly Gardens was a “collapsible corporation” as defined in Section 117 (m) of the Internal Revenue Code of 1939 (26 U.S.C. § 117(m) (1952 ed.)), so as to render gains realized by each plaintiff-stockholder from corporate distributions made in 1951 and 1953 taxable as ordinary income.
The distributions at issue were made out of surplus mortgage funds obtained for the construction of an apartment house project. On November 16, 1951, an aliquot distribution of $1,745 per share was made to the common stockholders of Wemberly Gardens, and on January 30, 1953, a further distribution of $260 per share was made in the same manner. Plaintiffs reported the income as long-term capital gains. *147 The Commissioner of Internal Revenue assessed deficiencies, treating the gains as ordinary income on the ground that the corporation was “collapsible” within the meaning of Section 117 (m). Plaintiffs paid the deficiencies, plus interest, and sue here for refunds.
The origin of the tax avoidance device known as the “collapsible corporation” and the considerations which induced Congress to enact Section 117 (m) of the 1939 Code have been discussed in Todd Tibbals and Helen A. Tibbals v. United States, decided this day, post, p. 196, and need not be repeated here.[1]
Section 117 (m) provides in substance that gain from the sale or exchange of stock in a collapsible corporation is to be treated as ordinary income if, in the absence of the Section, the gain would be considered a gain from the sale or exchange of a capital asset held for more than 6 months. To the extent here relevant, a collapsible corporation is defined as one formed or availed of principally for the construction of property with a view to a distribution to its shareholders before the corporation realizes a substantial part of the net income to be derived from the property and such shareholders realize a gain attributable to the property.
The applicable Treasury Regulation, Section 29.117-11 (b), provides that the statutory requirements for imposition of its provisions are satisfied where the view to a distribution is contemplated “unconditionally, conditionally, or as a recognized possibility” by those persons in a position to determine the policies of the corporation. The regulation also provides that if the distribution is attributable to circumstances present at the time of construction, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been formed or availed of with a view to the action described in the statute.
The question involved here has been litigated extensively. It has been held that the term “collapsible” applies to distributions from corporations which are not simply temporary *148 devices that are liquidated witliiu a short time of their organization, Glickman v. Commissioner, 256 F. 2d 108 (2d Cir. 1958) ; Burge v. Commissioner, 253 F. 2d 765 (4th Cir. 1958) ; that the word “principally” does not modify the phrase “with a view to” so as to restrict the operation of the statute to situations in which the proscribed objective was uppermost in the shareholder’s mind, Weil v. Commissioner, 252 F. 2d 805 (2d Cir. 1958) ; that the view which brings the statute into operation may exist ,at any time prior to the completion of the construction, Jacobson v. Commissioner, 281 F. 2d 703 (3d Cir. 1960), and that the requisite view is met where one of the collapsible events specified in Section 117(m) derives from circumstances which are present or which could reasonably be anticipated during the construction period, Mintz v. Commissioner, 32 T.C. 723, aff’d 284 F. 2d 554 (2d Cir. 1960). Furthermore, the Supreme Court has determined that the statute applies when the requisite factors coalesce despite an absence of tax avoidance purposes. In Braunstein v. Commissioner, 374 U.S. 65 (1963) the Supreme Court stated at page 71:
It is our understanding, in other words, that Congress intended to define what it believed to be a tax avoidance device rather than to leave the presence or absence of tax avoidance elements for decision on ,a case-to-case basis.
After a full trial in this court, Commissioner William E. Day found the following facts relative to the application of Section 117 (m):
39. Wemberly Gardens was availed of for the construction of an apartment house with a view towards making a distribution to the plaintiffs, prior to the realization by Wemberly of a substantial part of the net income to be derived from the apartment house.
40. This view mentioned in finding 39 existed at a time prior to the completion of the construction of the project.
Since the plaintiffs have failed to make the showing required to overcome the presumption of correctness accorded the trial commissioner’s findings by our Rule 66, we have adopted his findings. After a study of the record, we have concluded that the adopted findings are amply supported by the evi- *149 deuce and effectively preclude recovery by plaintiffs in this action.
The plaintiffs are children (or spouses of children) of the Eosenberg brothers, Isaac and Fisher. Fisher Eosenberg died in 1957. The brothers had been active in various real estate enterprises since 1920 and were engaged primarily in the business of constructing, renting and operating apartment houses. In 1946 or 1947 they, along with a business associate, acquired 30 lots in Jackson Heights, Queens County, New York. Initially, it had been the intention of the parties to construct an apartment house on the land to be financed by a conventional mortgage loan. Upon enactment of Section 608 of the National Housing Act of 1948, the brothers considered the desirability of obtaining a mortgage loan insured by the Federal Housing Administration. They felt that the insured loan would be preferable to a conventional loan because the interest rate would be lower, the repayment period longer, and the amount of the loan greater. Their associate parted company with them over fears that FHA control would adversely affect the profitable operation of the project. On April 13, 1949, the brothers filed with the FHA an “Application for Mortgage Insurance.”
The plans called for a six-story brick apartment building containing 210 family units. The estimated requirements for construction set forth in the application were prepared by the brothers and their architect. The estimated construction cost for the buildings and garages, plus builder’s and architectural fees as stated, was $1,931,562. The total estimated requirements listed by the Eosenbergs, including carrying charges, legal and organization expenses, and the cost of the land, amounted to $2,280,000. This sum was, as subsequently revealed at trial, inflated in several respects. The builder’s fee was scheduled at $81,250, but the Eosenbergs did not intend to pay that much since they planned to supervise the construction themselves at a cost which ultimately totaled only $30,000. The architect’s fee was estimated at $85,312, but the Eosenbergs had an agreement with the architect for a fee of $25,000. The mortgage amount as stated in the application was $1,836,000. After analysis of the application, the FHA issued to the Jamaica Savings Bank of New York *150 a “Commitment for Insurance,” wherein FHA agreed to insure the mortgage loan in the amount of $1,826,800 for construction of the Jackson Heights project.
With the mortgage loan agreement in hand, the brothers organized Wemberly Gardens on January 27, 1950, to construct, own, and operate the project. Of the authorized capital stock in the corporation, the 100 shares of preferred stock, par value $1 per share, were acquired by FHA while the brothers retained the 100 shares of no-par-value common stock. About June 12 of the same year, they transferred the common stock to their children, plaintiffs in this suit.
At all times during construction, the brothers supervised and controlled the operations of Wemberly Gardens. With their attorney, they constituted the board of directors and officers of the corporation.
In the mortgage agreement entered hito with the Jamaica Savings Bank, the brothers had listed the various estimated construction costs in a “Trade Payment Breakdown” (FHA Form 2636). Despite the fact that firm contracts had been entered into with various building suppliers and materialmen for the purchase of services and supplies, the Trade Payment Breakdown included some figures which substantially exceeded the contract prices. For example, the contract for elevators, dated February 8, 1950, was for $43,750, yet the listed price was $52,500. Similarly, the contract for gas ranges, dated February 3, 1950, was for $11,340, while the listing for ranges was $15,750. No explanation was given at the trial fox these variations. The total estimated cost of on-site construction, exclusive of fees, as listed in the Trade Payment Breakdown was $1,702,030. The total expenses actually incurred amounted to $1,708,726.38 ,and included the cost of the land, all improvements, builder’s and architectural fees, carrying charges and financing, and legal and organization fees. The actual cost of the physical construction was $1,452,097. Thus, the amount of the mortgage loan ($1,826,-800 — issued to cover physical construction) was $374,703 more than the construction cost and exceeded all costs by $118,074. It was the latter amount which was distributed as surplus on November 16,1951, and January 30,1953.
*151 All five units of the apartment building were completed and ready for occupancy before July 1, 1951. However, some minor construction work, consisting mainly if not entirely of landscaping, was performed thereafter during the summer. The record does not show exactly when all work was completed. By November 1, 1951, all the apartments had been rented.
During the construction of the project, the Bosenbergs exercised full control and supervision of the construction and handled all details of the financial accounts. At all times, they were fully apprised of the status of the construction, the amount of outstanding obligations, the balance of funds available from the mortgage loan and all other matters connected with the construction of the building and the payment of accounts. Without more, it seems unescapable that the brothers knew at some time prior to the completion of the construction that there would be a substantial sum available to Wemberly Gardens after all costs of the project had been satisfied. But the latter part of 1950 and the year 1951 were not normal times. With the Communist sweep through South Korea, the Korean hostilities began. During World War II, the Bosenberg brothers had operated about a dozen apartment houses and had faced spiraling construction costs, material shortages, labor scarcities, restrictive governmental regulations, and rental problems in the construction and operation of their properties. As construction on Wemberly Gardens proceeded, the brothers became concerned that tire Korean situation would have a similar effect on their operations.
To some extent, the problems they encountered during World War II rose again to confront the Bosenbergs. The demand for materials caused the prices of certain construction items to increase and shortages existed. To avoid undue delays in certain segments of construction, the Bosenbergs acceded to the demands of some materialmen and subcontractors and voluntarily increased existing contract prices. Substitutions became necessary for some materials which were totally unavailable. Delays in the delivery of building supplies occurred, labor shortages developed, and a New York *152 statute was passed permitting ,a person entering military service to terminate liis lease.
At the height of their concern over the Korean impact on their project, the board of directors of Wemberly Gardens (the Kosenbergs and their attorney) met and authorized the issuance of $200,000 of debentures, due in 10 years and bearing an interest rate of 1 percent per annum, to cover any unexpected contingencies. This action took place on December 1, 1950. Of the authorized debentures, only $55,000 worth were actually purchased and those purchases were made by a corporation owned and controlled by the Kosenbergs. Ke-payment of the debentures was made on September 27,1951.
Plaintiffs have cited no case in support of their position and do not appear to dispute the legal basis for treating the distributions they received as ordinary income, if the distributions had occurred under normal economic conditions. However, they contend that in the light of the Kosenbergs’ adverse experience during World War II and the wartime conditions which prevailed during and after the construction of the Wemberly Gardens project, it is against the weight of the evidence to conclude that the Kosenbergs held a view to distribution during construction. They argue that the apprehensions which the brothers entertained as a result of the conditions created by .the Korean conflict negates the existence of the necessary view to a distribution of the surplus.
The weakness hi plaintiff’s position is that it places the true picture out of focus. We begin with the unchallenged fact that the Kosenbergs had obtained a mortgage loan considerably in excess of all anticipated costs and had started construction of the proj ect before the Korean conflict erupted. Although plaintiffs gloss over this fact, we think it significant that construction of the project began with a built-in surplus. Therefore, we do not doubt that, at that time, they possessed a view toward making a distribution to the stockholders. However, we have found that the construction problems generated by the Korean hostilities caused the brothers to be seriously concerned about the adequacy of their financing during the latter portion of 1950 and for sometime during 1951. Indeed, the distributions that were made to the stockholders would undoubtedly have been much greater except *153 for the wartime increases in cost. There was, therefore, a period of time in which the Rosenbergs did not feel sure that the surplus 'loan proceeds could be distributed. The decisive fact, however, is that the increases in contract prices .and other construction problems resulting from the Korean situation occurred while the project was still in the process of construction. The evidence justifies the inference that by June 1,1951, when the first two units of the apartment were ready for occupancy, the fears previously entertained by the Rosenberg brothers had been considerably allayed. By June 26.1951, when the city of New York issued a final certificate of occupancy and before all construction had been completed, the Rosenbergs knew or should have known that a substantial surplus would be available for distribution to the stockholders. At the least, we are satisfied that before the project was completed, they recognized the possibility of a distribution of the surplus and, under the provisions of the Treasury Regulations, such a finding is sufficient to bring the distributions within the purview of Section 117 (m). The events that followed in rapid succession after the project was completed lead to that conclusion. On September 27,1951, a short time after construction had been completed, the $55,000 of debentures sold on December 18,1950, were repaid. By November 1.1951, all of the apartments had been rented. Hard on the heels of that occurrence and during the same month, the board of directors of Wemberly Gardens had the project revalued to create the revaluation surplus that was a prerequisite to a distribution to the stockholders. The first and larger distribution to the stockholders was made on November 16,1951, long before the corporation had realized a “substantial part of the net income to be derived” from the project.
Faced with the formidable factual obstacles recited above, plaintiffs have made an additional contention. Despite the fact that the surplus on hand at the time construction was completed was considerably more than enough to pay all the costs incurred on the project, including the cost of the land, they maintain that the Rosenbergs still believed that Wem-berly Gardens would need every dollar it had to carry on the project. That belief, they say, was grounded on the appre *154 hension that rent controls, the New York statute permitting persons in military service to terminate their leases, and the probability of a substantial vacancy rate would mean that the income from the .apartments would not cover expenses, plus debt service. A number of newspaper articles were admitted in evidence to show the state of mind of the Bosen-bergs during the pertinent period. In explanation of the speed with which the first distribution was made following full occupancy of the apartments, plaintiffs say that the Bosenbergs interpreted the newspaper accounts as showing that, by November 1, 1951, the prospect of peace in Korea was in sight. With that turn of events, they declare that the fears of the Kosenbergs that they would be unable to rent the project were dispelled. Their brief states that “the cessation of hostilities in Korea, which would have required a prophet to foretell during construction, was the immediate cause of the distribution.” The persuasiveness of that argument is considerably diminished by the fact that the newspaper account, which allegedly assured the Kosenbergs the conflict had ended, was not published until November 23, 1951, a week after the first distribution to the stockholders. Moreover, we take notice of the fact that significant action between the combatants in Korea continued into the latter part of 1952 and that the armistice was not signed until July 27, 1953.
In any event, plaintiffs have not established the existence of the facts upon which the Kosenbergs allegedly based their belief, prior to the completion of the project, that the apartment rentals would not be sufficient to pay estimated expenses and debt service. There is no evidence to show that Wem-berly Gardens lost any tenants as a result of the wartime law protecting tenants in military service. The record does not. support the claim that ,a substantial number of vacancies existed prior to November 1,1951, or that the rental experience for the project was other than normal prior to that time. Consequently, plaintiffs have not shown that before construction was finished, the occupancy rate threatened to be less than the minimum carrying charges, or that all or most of the surplus loan proceeds would be needed to sustain operations if such adverse conditions arose.
*155 In. summary, plaintiffs have not carried their burden of proving that the corporation was not formed or availed of with a view to making a distribution to its shareholders prior to a realization by the corporation of a substantial part of the net income to be derived from the apartment project. Therefore, plaintiffs’ petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) This is an action for the recovery of income taxes and deficiency interest paid thereon, brought by the plaintiffs for the tax years 1951 and 1953. During those years, each plaintiff (or his or her spouse) was a stockholder of Wem-berly Gardens Corporation (hereinafter referred to as “Wemberly Gardens”), a New York corporation.
('b) The sole issue presented in this suit is whether Wem-berly Gardens was a “collapsible corporation” as defined by section 111 (m) of the Internal Eevenue Code of 1939, so as to render gains realized by each plaintiff-stockholder from distributions made in 1951 and 1953 taxable as ordinary income.
2. (a) All of the plaintiffs (or their spouses) are children of either Isaac Eosenberg or Fisher Eosenberg, who were brothers. Fisher Eosenberg died in March 1957.
(b) Isaac and Fisher Eosenberg (hereinafter referred to as “the Eosenbergs”) had been 'active in various real estate enterprises since 1920. They had been engaged primarily in the business of constructing, renting and operating apartment houses.
3. In 1946 or 1947, the Eosenbergs and one Louis Quadry acquired 30 lots in Jackson Heights, Queens County, New York, through three corporations of which they were sole stockholders. Initially, it had been the intention of the parties to construct an apartment house on the land to be financed by a convenional building mortgage loan. However, upon enactment of section 608 of the National Housing Act of 1948, the parties gave consideration to the possibility of *156 obtaining a mortgage loan insured by the Federal Housing-Administration ('hereinafter referred to as “the FHA”).
d. The Eosenbergs felt that FHA 'insured financing would prove more desirable than a conventional mortgage loan because the rate of interest would be lower, the repayment period longer, and the amount of the loan greater. On the other hand, Quadry believed the FHA rental controls might jeopardize the profitable operation of the building. Because the parties were unable to reach agreement on the manner in Which they would proceed, the Eosenbergs purchased Quadry’s interest in the three corporations and thereby acquired complete control of the Jackson Heights lots.
5. On April 13, 1949, the Eosenbergs prepared and filed with the FHA an Application for Mortgage Insurance. The application indicated that the Eosenbergs, as sponsors for a corporation to be formed, planned to construct a six-story brick elevator apartment building containing 210 family units. The Eosenbergs listed the proposed corporation’s “Estimated Eequirements” for construction to be as follows:
Land improvements_ $15, 000
Construction (dwellings and garages)- 1,750,000
Fees (builder and architect)- 166,562
Total for all improvements_$1, 931, 562
Carrying charges and financing (including interest, taxes, insurance, FHA premium and fees, and title and recording expense, incurred only during construction)_ $103,438
Legal and organization expenses_ 5, 000
Total estimated requirements, exclusive of land_ 2, 040, 000
Land _ 240, 000
Total estimated requirements-$2,280,000
6. The estimated requiremeuts set forth in the Application for Mortgage Insurance were prepared by the Eosen-bergs with the assistance of their architect. The total estimated construction cost for dwellings and garages plus builders and architectural fees was given as $1,916,562. The builder’s fee was scheduled as $81,250, but the Eosenbergs did not intend to pay this in full, as they planned to supervise the construction themselves, at a cost which ultimately totaled $30,000. The architect’s fee had been estimated at *157 $85,312, but the Rosenbergs did not intend to pay the full fee, as they had agreed to pay the architect $25,000.
7. On December 30, 1949, FHA valuators prepared a Project Analysis (FHA Form No. 2264-W) regarding the proposed project. The “Estimated Replacement Cost of Property (as of December 31, 1947)” was scheduled as follows:
Land improvements_ $8, 617
Construction (dwellings and garages)_ 1,683,201
Fees (builder and architect)_ 173,410
Total for all improvements-$1, 865,228. 00
Carrying charges and financing- 84, 784.40
Legal and organization expense- 5, 000.00
Total estimated cost (exclusive of land)_ 1,955,012.40
Land_ 195, 000.00
Total estimate of replacement cost of property as of December 31,1947-$2,150, 012.40
The “Estimated Present Replacement Cost of Property as of December 30,1949” was scheduled at:
Land improvements_ $8, 669
Construction_ 1,693, 361
Fees- 174,457
Total for all improvements_$1, 876,487.00
Carrying charges and financing_ $84,784.40
Legal and organization expense_ 5, 000. 00
Total estimated cost (exclusive of land)- 1, 966,271.40
Land - 195,000. 00
Total estimated present replacement cost of property-$2,161,271.40
t8. In determining the maximum insurable mortgage, the FHA made the following analysis:
1. Total for all physical improvements, carrying charges, and financing (present cost)_$1,961,271
2. 90% of total estimated cost of property as of December 31, 1947, or present, whichever is lower_ 1,935, 011
3. Amount based on limitation as to debt service ratio_ 2, 066,633
4. Amount based on limitation of $8,100 per family unit— 1, 826,874
5. Mortgage amount stated in application_ 1, 836,000
*158 9. Thereafter, and pursuant to the provisions of section 608 of the National Housing Act, the FHA issued to the Jamaica Savings Bank of New York a Commitment for Insurance (FHA Form No. 2432-W) wherein the FHA agreed to insure a mortgage loan in the amount of $1,826,800 for construction of the Jackson Heights project.
<10. On January 27,1950, the Eosenbergs organized Wem-berly Gardens to construct, own, and operate the project for which the FHA commitment had been issued. The authorized capital stock of Wemberly Gardens consisted of 100 shares of preferred stock, par value $1 per share, and 100 shares of common stock, without par value. Isaac and Fisher Rosenberg each acquired 50 shares of the common stock, and the FHA acquired all the preferred stock. On June 12,1950, Fisher Rosenberg transfeiTed all 'his shares to his children. On the same date, Isaac Rosenberg transferred all but two of his shares to his children, transferring the remaining two shares to said children shortly thereafter.
11. At all times during construction, the Rosenbergs supervised and controlled the operations of Wemberly Gardens. They and their attorney constituted the board of directors and the officers of Wemberly Gardens.
12. On May 25, 1950, a Building Loan Agreement (for use under section 608) in the amount of $1,826,800 was entered into between Wemberly Gardens as mortgagor, and the Jamaica Savings Bank as mortgagee. The agreement provided for interest payments on the loan at the rate of 4 percent per annum, the loan to be fully repaid by April 1, 1984.
13. Paragraph 4 of the Building Loan Agreement provided in pertinent part:
* * * The advance to which the Borrower shall be entitled, with respect to construction items, shall be the total of the purchase price of uninstalled materials stored on the mortgaged property in a manner acceptable to the 'Commissioner plus the cost of the portions of the work acceptably completed, as approved by the Lender and the Commissioner, computed in accordance with the amounts assigned to the several items in the Payment Breakdown, hereto annexed marked Exhibit B, less 10 percent less prior advances. * * *
*159 Exhibit B referred to in. the mortgage agreement, a Trade Payment Breakdown (FHA Form 2636), was prepared on May 19,1950, by Isaac Rosenberg as president of Wemberly Gardens, and accepted on that date by the FHA. Prior to that date, the Rosenbergs had entered into numerous contracts with various building suppliers and materialmen for the purchase of such items as elevators, gas ranges, incinerators, medicine cabinets, linoleum and carpeting, refrigerators, oil burners, Venetian blinds, a sprinkler system, etc. The Rosenbergs had also previously contracted for such work as excavation, masonry, carpentry, painting, roofing, lathing and plastering, plumbing, etc. In some instances, however, the amounts which had been scheduled in the Trade Payment Breakdown substantially exceeded the existing price that had already been set by contract. For example, the contract for elevators dated February 8, 1950, was $43,750, yet in the Trade Payment Breakdown an amount of $52,500 is listed for elevators. Similarly, the contract for gas ranges, dated February 3, 1950, was for $11,340, while the Trade Payment Breakdown lists an amount of $15,750 for ranges. Mr. Rosenberg could not explain why the figures in the Trade Payment Breakdown exceeded the known contract price.
14. The Trade Payment Breakdown contained a total estimated cost of on-site construction, exclusive of fees, of $1,702,030. This consisted of a detailed schedule of 35 construction items totaling $1,693,226, plus on-site utilities and landscaping costs of $8,804.
15. On or about June 1, 1950, construction of the Wem-berly Gardens project began. Shortly thereafter the Korean hostilities erupted. At about the same time, excavation had been completed and the foundation work had just started.
16. As construction proceeded, the Rosenbergs became concerned about the effect that the Korean situation might have on the Wemberly Gardens project. During World War II they operated about a dozen apartment houses and had faced spiraling construction costs, material shortages, labor scarcities, restrictive governmental regulations, and rental problems, in the construction and management of their apartment buildings, and they feared that the Koren conflict might create similar difficulties.
*160 17. To some extent, the same construction problems and difficulties which had confronted the Eosenbergs during World War II arose again. The demand for materials caused the prices of certain construction items to increase and shortages existed. To avoid undue delays in the construction of the project, the Eosenbergs acceded to the demands of certain materialmen and subcontractors and voluntarily increased existing contract prices. Certain materials Which were needed for construction were totally unavailable, necessitating the use of substitute materials. Delays in the delivery of building supplies were encountered. A labor shortage developed. A New York statute was passed permitting a person entering military service to terminate 'his lease.
18. All upward adjustments in contract prices occurred while the Wemberly Gardens project was still in the process of construction. No significant adjustments in costs or other circumstances arose after completion of construction to alter the ultimate cost of construction.
19. The first two units of the apartment house project were ready for occupancy June 1, 1951, and the remaining three units were ready for occupancy before July 1,1951. A final certificate of occupancy was issued by the city of New York for the entire project on June 26, 1951. Although landscaping remained to be done, by the end of June the building was ready for occupancy. Construction was then completed as the apartment house was ready to begin earning a substantial part of its net income.
20. During construction of the project, Wemberly Gardens actually incurred the following expenses:
Total improvements (including land and improvements, construction of dwellings and garages, architect’s fee and builder’s expense)_$1, 452, 097.33
Carrying charges and financing (including interest, taxes, insurance, FHA premium and fees, and builder’s expense)_ 97,868.12
Legal and organization expenses_ 7,348. 92
Land - 151,412.01
Total costs_§1,708,726.38
21.At the time the Eosenbergs submitted their Application for Mortgage Insurance to the FHA, they anticipated *161 that the proceeds from the mortgage loan, would be sufficient to cover all costs incurred during construction of the project. However, subsequently, the Eosenbergs became apprehensive about the possibility of rising costs due to the Koren conflict. On December 1,1950, the board of directors of Wem-berly Gardens (the Eosenbergs and their attorney) met to authorize the issuance of $200,000 of debentures. The pertinent portion of the minutes is the following:
* * * The President then stated that in connection with the construction of this project * * * the corporation would require additional monies to finance the cost of said construction; that as an FELA, mortgage loan was placed on said premises Counsel had advised that no secondary financing by mortgage loan could be made; that the only alternative to raise the additional money required was by the issuance of debenture bonds and that approximately $200,000.00 was needed by the corporation.
The. board of directors then authorized the issuance of $200,000 of debentures due in 10 years, and bearing an interest rate of 1 percent per annum. On December 18, 1950, a corporation owned and controlled by the Eosenbergs purchased $55,000 of the debentures. The debentures were repaid on September 27,1951.
22. The actual cost of physical construction was $1,452,097. The amount of the mortgage loan ($1,826,800) exceeded the actual cost of construction by $374,703. The total cost of the project including all fees, carrying and financing charges, organizational and legal expenses, and land was $1,708,726.38. The mortgage exceeded this amount by $118,074.
23. The Eosenbergs supervised and controlled all aspects of the construction of the project and also handled the financial accounts. At all times, the Eosenbergs were fully apprised of, and well acquainted with the status of construction, the amount of outstanding obligations, the balance of funds available from the mortgage loan and all other matters connected with the construction of the building and payment of accounts. The Eosenbergs thus knew or should have known prior to the completion of the construction that there would be a substantial sum available to Wemberly Gardens after all costs of the project had been satisfied.
*162 24. The Rosenberg's rented some of tbe Wemberly Gardens apartments from plans before completion of construction. There is no evidence as to what percentage of apartments were rented by the time that the certificate of occupancy was granted. Similarly, there is no evidence in the record that any tenants were members of the Armed Forces and broke their leases upon being called to active duty. Neither is there any evidence as to 'how many apartments were rented or vacant between the end of June and November. By November 1st all apartments were rented.
25. In November 1951, pursuant to a meeting of the board of directors of Wemberly Gardens, the project was revalued by an appraiser to create a revaluation surplus which was necessary under state law before a distribution to stockholders could be made.
26. On November 16,1951, the board of directors of Wem-berly Gardens resolved upon a distribution of $1,745 per share out of capital surplus to the common stockholders of record on December 4,1951.
27. On January 30, 1953, a further distribution of $260 per share payable out of capital surplus was made to common stockholders of Wemberly Gardens.
28. Wemberly Gardens reported its net income or net loss for Federal income tax purposes (in both cases before any net operating loss deduction on account of net operating loss carryover) for the years 1950-1953 to be as follows:
1950 _$13, 758. 57 (loss)
1951_ 6,277. 00 (loss)
1952 _ 22, 081. 56
1953 _ 1, 089.40 (loss)
Its earned surplus and undivided profits were reported for federal income tax purposes at the end of each year as follows:
1950 _$13, 758. 57 (loss)
1951 - 6,277. 00 (loss)
1952 _ 1,432.18
1953 _ 342. 79
29.Plaintiff Celia Maliner is, and at all times after June 12, 1950, was a stockholder of Wemberly Gardens Corpora *163 tion, a corporation organized under the laws of tbe State of New York.
Plaintiffs Martin and Celia Maliner are husband and wife residing in New York City, and prior to March 31,1952, filed their joint income tax return for 1951 with and paid tax in the amount of $3,814.16 reported therein to the Collector of Internal Eevenue, Brooklyn, New York.
In said return for 1951, plaintiffs Martin and Celia Maliner reported a distribution to plaintiff Celia Maliner on December 5,1951, from Wemberly Gardens Corporation in the sum of $12,464.29, and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Eevenue Service of said return for 1951, a deficiency in the amount of $2,897.18 was assessed, the said deficiency, to the extent of $2,576.86, being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 8, 1955, said deficiency in the sum of $2,897.18 was paid to the District Director of Internal Eevenue, Brooklyn, New York.
Plaintiffs Martin and Celia Maliner prior to March 31, 1954, filed their joint income tax return for 1953, with and paid tax in the amount of $4,204.48 reported therein to the Collector of Internal Eevenue, Brooklyn, New York.
In said return for 1953 plaintiffs Martin and Celia Maliner reported a distribution to plaintiff Celia Maliner on January 30, 1953 from Wemberly Gardens Corporation in the sum of $1,857 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Eevenue Service of said return for 1953, a deficiency in the amount of $706.66 was assessed, the said deficiency to the extent of $387.70 being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 8, 1955, the said deficiency in the sum of $706.66 was paid to the District Director of Internal Eevenue, Brooklyn, New York.
30. Plaintiff Arthur Eosenberg is, and at all times after June 12,1950, was a stockholder of Wemberly Gardens Cor *164 poration, a corporation organized under the laws of tbe State of New York.
Plaintiffs Arthur and Carol Rosenberg are husband and wife residing in New York City, and prior to March 31, 1952, filed their joint income tax return for 1951, with and paid tax in the amount of $4,111.52 reported therein to the Collector of Internal Revenue, Brooklyn, New York.
In said return for 1951, plaintiffs Arthur and Carol Rosenberg reported a distribution to plaintiff Arthur Rosenberg on December 5, 1951, from Wemberly Gardens Corporation in the sum of $12,464.29, and reported same on said return as a long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1951, a deficiency in the amount of $2,541.52 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 3, 1955, said deficiency in the sum of $2,541.52 was paid to the District Director of Internal Revenue, Brooklyn, New York.
Plaintiffs Arthur and Carol Rosenberg prior to March 31, 1954, filed their joint income tax return for 1953, with and paid tax in the amount of $3,573.30 reported therein to the Collector of Internal Revenue, Brooklyn, New York.
In said return for 1953, plaintiffs Arthur and Carol Rosenberg reported a distribution to Arthur Rosenberg on January 30, 1953, from Wemberly Gardens Corporation in the sum of $1,857 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1953, a deficiency in the amount of $585.64 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 3,1955, said deficiency in the sum of $585.64 was paid to the District Director of Internal Revenue, Brooklyn, New York.
31. Plaintiff Bernard Rosenberg is, and at all times after June 12,1950, was a stockholder of Wemberly Gardens Cor *165 poration, a corporation organized under the laws of the State of New York.
Plaintiffs Bernard and Bita Rosenberg are husband and wife residing in New York City, and prior to March 31, 1952, filed their joint income tax return for 1951 with and paid tax in the amount of $5,618.52 reported therein to the Collector of Internal Revenue, Brooklyn, New York.
In said return for 1951 plaintiffs Bernard and Rita Rosenberg reported a distribution to plaintiff Bernard Rosenberg on December 5, 1951, from Wemberly Gardens Corporation in the sum of $43,625 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1951, a deficiency in the amount of $10,877.14 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 13, 1955, said deficiency in the sum of $10,877.74 was paid to the District Director of Internal Revenue, Brooklyn, New York.
Plaintiffs Bernard and Rita Rosenberg prior to March 31, 1954, filed their joint income tax return for 1953 with and paid tax in the amount of $2,283.24 reported therein to the Collector of Internal Revenue, Brooklyn, New York.
In said return for 1953, plaintiffs Bernard and Rita Rosenberg reported a distribution to plaintiff Bernard Rosenberg on January 30, 1953 from Wemberly Gardens Corporation in the sum of $6,500 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1953, a deficiency in the amount of $975.92 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 13, 1955, the said deficiency in the sum of $975.92 was paid to the District Director of Internal Revenue, Brooklyn, New York.
32. Plaintiff Charles Rosenberg is, and at all times after June 12, 1950, was a stockholder of Wemberly Gardens *166 Corporation, a corporation organized under the laws of the State of New York.
Plaintiffs diaries and Minnie Rosenberg are husband and wife residing in New York City, and prior to March 31, 1952, filed their joint income tax return for 1951 with and paid tax in the amount of $2,273.31 reported therein to the Collector of Internal Revenue, Third District, New York.
In said return for 1951, plaintiffs Charles and Minnie Rosenberg reported a distribution to plaintiff Charles Rosenberg on December 5,1951, from Wemberly Gardens Corporation in the sum of $12,464.29 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1951, a deficiency in the amount of $1,945.28 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On March 12,1956, and March 22,1956, said deficiency in the sum of $1,945.28 was paid to the District Director of Internal Revenue, Third District, New York.
Plaintiffs Charles and Minnie Rosenberg prior to March 31, 1954, filed their joint income tax return for 1953 with and paid tax in the amount of $464.23, reported therein to the Collector of Internal Revenue, Third District, New York.
In said return for 1953, plaintiffs Charles and Minnie Rosenberg reported a distribution to plaintiff Charles Rosenberg on January 30,1953, from Wemberly Gardens Corporation in the sum of $1,857 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1953, a deficiency in the amount of $432.87 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On March 19,1956, the said deficiency in the sum of $432.87 was paid to the District Director of Internal Revenue, Third District, New York.
33. Plaintiff Harold Rosenberg is, and at all times after June .12, 1950, was a stockholder of Wemberly Gardens *167 Corporation, a corporation organized under the laws of the State of New York.
Plaintiffs Harold and Roslyn Rosenberg are husband and wife residing hi New York City, and prior to March 31,1952, filed their joint income tax return for 1951, with and paid tax in the amount of $880.32 reported therein to the Collector of Internal Revenue, Brooklyn, New York.
In said return for 1951, plaintiffs Harold and Roslyn Rosenberg reported a distribution to plaintiff Harold Rosenberg on December 5,1951, from Wemberly Gardens Corporation in the sum of $12,464.28 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1951, a deficiency in the amount of $1,963.96 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 6, 1955, said deficiency in the sum of $1,963.96 was paid to the District Director of Internal Revenue, Brooklyn, New York.
Plaintiffs Harold and Roslyn Rosenberg prior to March 31, 1954, filed their joint income tax return for 1953 with and paid tax in the amount of $401.81 reported therein to the Collector of Internal Revenue, Brooklyn, New York.
In said return for 1953, plaintiffs Harold and Roslyn Rosenberg failed to report a distribution to plaintiff Harold Rosenberg on January 30, 1953, from Wemberly Gardens Corporation in the sum of $1,857.
Thereafter, upon audit by the Internal Revenue Service of said return for 1953, a deficiency in the amount of $445.79 was assessed, the said deficiency being based upon the claim that the said amount not reported was ordinary income.
On June 6, 1955, the said deficiency in the smn of $445.79 was paid to the District Director of Internal Revenue, Brooklyn, New York.
34. Plaintiff Lester Rosenberg is, and at all times after June 12,1950, was a stockholder of Wemberly Gardens Corporation, a corporation organized under the laws of the State of New York.
*168 Plaintiffs Lester and Florence Bosenberg are liusband and wife, residing in New York City, and prior to March 31, 1952, filed their joint income tax return for 1951 with and paid tax in the amount of $5,724.24 reported therein to the Collector of Internal Bevenue, Brooklyn, New York.
In said return for 1951, plaintiffs Lester and Florence Bosenberg reported a distribution to plaintiff Lester Bosen-berg on December 5, 1951, from Wemberly Gardens Corporation in the sum of $43,625 and reported same in said return as long-term capital gain.
Thereafter, upon audit 'by the Internal Bevenue Service of said return for 1951, a deficiency in the amount of $10,926.50 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 20, 1955, said deficiency in the sum of $10,926.50 was paid to the District Director of Internal Bevenue, Brooklyn, New York.
Plaintiffs Lester and Florence Bosenberg prior to March 31,1954, filed their joint income tax return for 1953 with and paid tax in the amount of $2,173.06 reported therein to the Collector of Internal Bevenue, Brooklyn, New York.
In said return for 1953, plaintiffs Lester and Florence Bosenberg reported a distribution to plaintiff Lester Bosen-berg on January 30,1953, from Wemberly Gardens Corporation in the sum of $6,500 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Bevenue Service of said return for 1953, a deficiency in the amount of $956.96 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 13, 1955, the said deficiency in the sum of $956.96 was paid to the District Director of Internal Bevenue, Brooklyn, New York.
35. Plaintiffs Arthur Bosenberg, Plarold Bosenberg, and Charles Bosenberg as trustees under trust indenture dated June 12, 1950, for the benefit of Dave Bosenberg are, and at all times after June 12,1950, as trustees, were stockholders *169 of Wemberly Gardens Corporation, a corporation organized under the laws of the State of New York.
Plaintiff trustees prior to March 31, 1952, filed an income tax return for said trust for 1951 with and paid tax in the amount of $1,384.43 reported therein to the Collector of Internal Revenue, Third District, New York.
In said return for 1951 said plaintiff trustees reported a distribution to said plaintiff trustees on December 5, 1951, from Wemberly Gardens Corporation in the sum of $12,464.28 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1951, a deficiency in the amount of $2,248.21 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On March 19, 1956, said deficiency in the sum of $2,248.21 was paid to the District Director of Internal Revenue, Third District, New York.
Plaintiff trustees for the benefit of Dave Rosenberg, prior to March 31, 1954, filed an income tax return for said trust for 1953 with and paid tax in the amount of $252.24 reported therein to the Collector of Internal Revenue, Third District, New York.
In said return for 1953, said plaintiff trustees reported a distribution to said plaintiff trustees on January 30, 1953, from Wemberly Gardens Corporation in the sum of $1,857 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Revenue Service of said return for 1953, a deficiency in the amount of $207.68 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On March 22,1956, the said deficiency in the sum of $207.68 was paid to the District Director of Internal Revenue, Third District, New York.
36. Plaintiff Gladys Simon is, and at all times after June 12, 1950, was a stockholder of Wemberly Gardens Corporation, a corporation organized under the laws of the State of New York.
*170 Plaintiffs Jack and Gladys Simon are husband and wife, residing in New York City, and prior to March 81, 1952, filed their joint income tax return for 1951 with and paid tax in the amount of $2,404.16 reported therein to the Collector of Internal Bevenue, Brooklyn, New York.
In said return for 1951, plaintiffs Jack and Gladys Simon reported a distribution to plaintiff Gladys Simon on December 5,1951, from Wemberly Gardens Corporation in the sum of $12,464.29 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Bevenue Service of said return for 1951, a deficiency in the amount of $1,927.58 was assessed, the said deficiency 'being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 13, 1955, said deficiency in the sum of $1,927.58 was paid to the District Director of Internal Bevenue, Brooklyn, New York.
Plaintiffs Jack and Gladys Simon prior to March 31,1954, filed their joint income tax return for 1953 with and paid tax in the amount of $638.36 reported therein to the Collector of Internal Bevenue, Brooklyn, New York.
In said return for 1953, plaintiffs Jack and Gladys Simon reported a distribution to plaintiff Gladys Simon on January 30,1953, from Wemberly Gardens Corporation in the sum of $1,857 and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Bevenue Service of said return for 1953, a deficiency in the amount of $213.20 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On July 27,1955, the said deficiency in the sum of $213.20 was paid to the District Director of Internal Bevenue, Brooklyn, New York.
37. Plaintiff Lila Young is, and at all times after June 12, 1950, was, a stockholder of Wemberly Gardens Corporation, a corporation organized under the laws of the State of New York.
*171 Plaintiffs Victor and Lila Young are husband and wife residing in New York City, and prior to March 31, 1952, filed their joint income tax return for 1951 with and paid tax in the amount of $2,385.56 reported therein to the Collector of Internal Bevenue, Brooklyn, New York.
In said return for 1951, plaintiffs Victor and Lila Young reported a distribution to plaintiff Lila Young on December 4, 1951, from Wemberly Gardens Corporation in the sum of $12,464.29, and reported same on said return as long-term capital gain.
Thereafter, upon audit by the Internal Bevenue Service of said return for 1951, a deficiency in the amount of $1,922.06 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On June 13, 1955, and August 15, 1955, said deficiency in the sum of $1,922.06 was paid to the District Director of Internal Bevenue, Brooklyn, New York.
Plaintiffs Victor and Lila Young prior to March 31,1954, filed their joint income tax return for 1953 with and paid tax in the amount of $932.14 reported therein to the Collector of Internal Bevenue, Brooklyn, New York.
In said return for 1953, plaintiffs Victor and Lila Young reported a distribution to plaintiff Lila Yotmg on January 30,1953, from Wemberly Gardens Corporation in the sum of $1,857 and reported same in said return as long-term capital gain.
Thereafter, upon audit by the Internal Bevenue Service of said return for 1953, a deficiency in the amount of $188.68 was assessed, the said deficiency being based upon the claim that the said amount reported as capital gain was in fact ordinary income.
On Juno 13,1955, the said deficiency in the sum of $188.68 was paid to the District Director of Internal Bevenue, Brooklyn, New York.
38. Timely claims for refund were made by each plaintiff, but said claims were either disallowed in due course, or no action was taken upon them, by the Internal Bevenue Service.
*172 39. Wemberly Gardens was availed of for the construction of an apartment house with a view towards making a distribution to the plaintiffs, prior to the realization by Wemberly of a substantial part of the net income to be derived from the apartment house.
40. This view mentioned in finding 39 existed at a time prior to the completion of the construction of the project.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is, therefore, dismissed.

For a statement regarding the nse of the collapsible corporation in the construction industry in situations where the mortgages insured by the EHA substantially exceeded costs of construction, see Freeman, Collapsible Corporations, 11 N.Y.U. Inst. 408 (1953).