Anne **GELFAND** et al.

v.

The **UNITED STATES**.

No. 385–62.

United States Court of Claims.

April 14, 1967.

Albert E. Arent, Washington, D. C., attorney of record, for plaintiffs. Joel N. Simon and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

COLLINS, Judge.

In this suit, plaintiffs seek refund of Federal income taxes for the years 1950–53. The controversy focuses upon section 117(m) of the Internal Revenue Code of 1939 [1]—more familiarly recognized as the "collapsible corporation" provisions.[2] This section, first introduced into the Internal Revenue Code in 1950, was designed to prevent use of the corporate form as a means of escaping ordinary income treatment through the guise of accelerated capital gains. The issue here is whether the Commissioner of Internal Revenue was correct in claiming that section 117(m) required plaintiffs to treat as ordinary income, rather than as capital gain, certain corporate distributions received by them.

The case was originally submitted to our trial commissioner on a stipulated set of facts. It was his recommendation that plaintiffs should prevail. However, we are of the persuasion that the issue, while not without its difficulties, must be resolved in the Government's favor. The relevant facts are as follows:

During the taxable years in question, plaintiffs were minority stockholders in seven corporations, each of which owned and operated its own rental housing unit. Six of these corporations, respectively designated as Queenstown Apartments A, B, C, D, E, and G, were formed in 1947 and 1948; the seventh corporation, which owned and operated an apartment unit known as the Berkshire, was organized in 1949. Operating with mortgage financing insured by the Federal Housing Administration, each corporation, upon its formation, undertook the construction of an apartment house. The Queenstown Apartments—a multi-unit garden-type project—saw the completion of its last section (i. e., section G) in

---

1. Unless otherwise noted, all references herein shall be to the Internal Revenue Code of 1939.

2. Int.Rev.Code of 1939, § 117(m), added by ch. 994, § 212(a), 64 Stat. 934 (1950), as amended, ch. 521, § 326, 65 Stat. 502 (1951) (now Int.Rev.Code of 1954, § 341, as amended).

August 1949; Berkshire, a high-rise apartment building, was completed in 1950.

Corporate capitalization consisted, in each instance, of 100 shares of preferred stock ($1 par value), issued to the Federal Housing Administration, and 500 shares of Class B common stock (without par value), issued to its regular shareholders. Plaintiffs, each of whom acquired his or her interest in 1950, held, as individuals, from 1 to 6 percent of the total stock of the seven corporations. Collectively, they held a 29-percent interest in the seven corporations.

Within 3 years after the respective dates of completed construction, each of the seven corporations made cash distributions to its Class B shareholders in amounts proportionate to its shareholders' respective interests. The source of these distributions was the rental income realized by the corporations from their normal business operations.[3]

Plaintiffs filed their income tax returns for the calendar years 1950, 1951, 1952, and 1953, reporting the cash distributions which they had received as capital gains to the extent that such distributions exceeded the costs of their stock. Deficiencies were assessed against each plaintiff on the ground that the Queenstown and Berkshire corporations were "collapsible corporations" within the meaning of section 117(m) of the Internal Revenue Code of 1939 and that the gain from such distributions should be taxed at ordinary income rates. The assessments were paid as shown in the detailed findings, claims for refund were made and disallowed, and this suit followed.

Plaintiffs concede that, to the extent that the distributions were made out of earnings and profits, their gain is prop-

erly characterized as ordinary income. However, as to the greater portion of each distribution, which admittedly was not out of earnings and profits, plaintiffs contend that this should be accorded preferential capital gains treatment.

Their argument for this result is threefold. First, it is contended that section 117(m) applies only to gain from a sale or exchange and does not apply to nonliquidating distributions. In support of this argument, plaintiffs look to the words of section 117 which reads, in relevant part, as follows:

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—*Gain from the sale or exchange* (whether in liquidation or otherwise) *of stock of a collapsible corporation*, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, *shall*, except as provided in paragraph (3), *be considered as gain from the sale or exchange of property which is not a capital asset*. [Emphasis supplied.] [64 Stat. 934.]

Plaintiffs point to the fact that their gains (i. e., the distributions received) did not derive from a sale or exchange, either in liquidation or otherwise, but were simply nonliquidating distributions stemming from the corporations' rental income. And since, in this case, these distributions exceeded (for the most part) not only the distributing corporations' earnings and profits, but also plaintiffs' bases for their stock, they contend that all amounts in excess of bases should be accorded capital gain treatment, as provided in section 115 (d).[4]

---

3. In the case of two of the Queenstown corporations, the distributions also included a small portion of excess mortgage funds.

4. Int.Rev.Code of 1939, § 115(d), 53 Stat. 47, amended by ch. 247, § 214(b), 53 Stat. 873, provides as follows:
"(d) OTHER DISTRIBUTIONS FROM CAPITAL.—If any distribution made by a corporation to its shareholders is not out of

increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a

The sticking point in this argument, and that which robs it of much of its persuasiveness, is the fact that section 117(m) condemns to ordinary income status not only the gain which might result from a sale or exchange, but also the gain resulting from a corporation's *distributions to its shareholders*.

Section 117(m), in its definitional paragraph (subpart 2), provides:[5]

> (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—
>
> (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), *or a distribution to its shareholders*, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, * * *.
> [Emphasis supplied.]

Considered in light of the above, section 117(m) would seem quite clearly to include within its scope the presently considered distributions. And it would follow from this, that, if the statute's other requisites be satisfied, plaintiffs were properly required to treat their gains as ordinary income.

■ To overcome this conclusion, plaintiffs offer their second contention.

They argue that the "distribution" referred to above (section 117(m)(2)(A) (i)) speaks not to a distribution of cash, but rather to a distribution *of the property* which the collapsible corporation either had manufactured, constructed, or produced. For proof of this position, we are referred to the relevant legislative history.[6]

Typical of the views expressed on this point are those set forth by the Senate's Committee on Finance.[7] Its report states, in part, with respect to the proposed section on "Treatment of Gains to Shareholders of Collapsible Corporations," the following:

> This section of the bill adds a new subsection (m), relating to collapsible corporations, to section 117 of the code. The collapsible corporation is a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent.
>
> Under paragraph (1) of the subsection as added to the code, gain from the sale or exchange of stock of a collapsible corporation will be treated as gain from the sale or exchange of property which is not a capital asset. This treatment is to be effective, however, only to the extent that the use of the device is interpreted as giving rise to gain which gain is considered (but for the provisions of the subsection) as long-term capital gain.
>
> * * * * * *
> * * * The corporation, furthermore, has been so defined as to de-

---

distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1), is not treated as a dividend, whether or not otherwise a dividend."

5. As quoted above, § 117(m) reflects the amendments introduced by way of the Revenue Act of 1951, ch. 521, § 326, 65 Stat. 502. Prior to this change, § 117(m) (2) (A) did not reach those corporations whose "collapsible" property was acquired through purchase.

6. H.R.REP.No. 2319, 81st Cong., 2d Sess. 96 (1950–2 CUM.BULL. 380, 449); S.REP. No. 2375, 81st Cong., 2d Sess. 88 (1950–2 CUM.BULL. 483, 546). See also 1950–2 U.S.Code Cong.Service, pp. 3099, 3145, 3232.

7. S.REP.No. 2375, 81st Cong., 2d Sess., 1950–2 U.S.Code Cong.Service, supra at pp. 3145, 3146.

scribe corporations different in kind from those which ordinarily liquidate following normal business operations. This objective has been specifically strengthened by the statement made in subparagraph (i) above, to the effect that the sale or exchange or the distribution be made prior to the realization by the corporation of a substantial part of the net income to be derived from the property. Although in many cases an ordinary corporation may distribute property in kind in the course of its liquidation, or the stock in such a corporation may be sold prior to the realization by the corporation of the net income to be derived from some of its property, such a corporation could not be considered to have been formed or availed of principally for the manufacture, construction, or production of that property alone.

While the primary use made of collapsible corporations in the past has usually involved their liquidation in the manner indicated above, it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests at the time and under the circumstances when the corporation might otherwise be liquidated. *In like manner, the corporation might distribute the property in question without liquidating and, under section 115 (d), the value of the property distributed, to the extent that it was not a dividend, would first be applied against the adjusted basis of the stock to the shareholders and the excess, if any, would be taxable in the same manner as a gain from the sale or exchange of property. Paragraph (1) of the*

*subsection, in prescribing the treatment to be given the gain from the sale or exchange of stock of a collapsible corporation, is deemed to refer to this excess value in the case of a distribution made by the corporation other than in liquidation.* Such a distribution is specifically referred to in connection with the definition of the term "collapsible corporation" in paragraph (2) of the subsection. Both paragraph (1) and paragraph (2) of the subsection refer to a sale or exchange of the stock other than in liquidation. [Emphasis supplied.]

In light of the above, there can be little question that Congress, in its use of the term "distribution," clearly meant to include gains deriving from a distribution of property, *irrespective of whether such distribution occurred in the context of a formal liquidation.* In other words, even though there be no sale or exchange of stock, either in liquidation or otherwise, section 117(m) remains operative. But to read the term "distribution," as plaintiffs urge, so as to limit its applicability only to those situations where there is a distribution of property (as opposed to a distribution of cash) would not only impart to the statute a limitation which it does not contain, but would also result in attributing to Congress a singular shortsightedness.

It is a foregone conclusion that if, in this case, plaintiffs were to have received their cash distributions pursuant to a pro rata redemption of part of their stock, that transaction would have been viewed as a "sale," [8] and, as such, would fall squarely within the operative language of section 117(m), i. e., "[g]ain from the sale or exchange (whether in liquidation *or otherwise*) of stock \* \* \*." [9]

(Emphasis supplied.)

8. Under ordinary circumstances, a distribution received pursuant to a partial redemption would result in ordinary income to the recipient. However, that result would not obtain here (in the absence of § 117(m)) because the lack of earnings and profits would bring the distribution within the prescribed capital gain treat-

ment specified by § 115(d). The transaction would therefore be deemed a sale rather than a distribution essentially equivalent to a dividend.

9. While our opinion emphasizes the "or otherwise" language of § 117(m), it should be noted that, prior to 1954, the Internal Revenue Code did not distinguish between

And if, in this context, a cash distribution must yield to ordinary income treatment, then surely the same result obtains where cash is received without the attendant formalities of a partial stock surrender. We can see no meaningful distinction, insofar as the application of section 117(m) is concerned, between a shareholder's obtaining his cash through a partial stock redemption as opposed to the more direct reach into the corporate pocketbook which the cash distribution affords. After a pro rata redemption, the participating shareholders would own precisely the same interests in the corporate property and in the same proportions; they would stand in the same relation as would those stockholders who drew out the corporation's cash by means of a direct distribution. The two transactions are alike in all respects save their label.

These considerations, coupled with Congress' clearly expressed intent to include within the catalog of condemned devices a distribution which did not involve the sale or exchange of stock, persuade us that the "distribution" thus referred to in section 117(m) encompasses cash as well as other property. Like conclusions were reached in Pomponio v. Commissioner, 288 F.2d 827 (4th Cir. 1961); Glickman v. Commissioner, 256 F.2d 108 (2d Cir. 1958); and Burge v. Commissioner, 253 F.2d 765, 769 (4th Cir. 1958). Indeed, any other view would result in ascribing to Congress the unique position of recognizing (for section 117(m) purposes) the equivalency between a sale or exchange and a distribution, on the one hand, while meting out differing tax consequences with the other. The statute should not be read in such an unbalanced fashion.

With respect to the argument that a distribution of property effects a corporate contraction, while the cash distribution here described would not, this does not spell out a meaningful distinction. It might well be true that the abuses which figured most prominently in the legislative mind were those involving the "temporary" corporation (with liquidation or partial contraction following shortly after formation), but the statute does not require that the elements of a contraction be present before its provisions become operative. Relevant case law does not support a contrary view. See Mintz v. Commissioner, 284 F.2d 554 (2d Cir. 1960); Glickman v. Commissioner, supra.

■ We come then to the final point which plaintiffs have raised. They contend that, regardless of our construction of the statute, its application would not be warranted because of the absence here of the prohibited "view."

To qualify as a collapsible corporation under section 117(m), a corporation must have been formed or availed of for the manufacture, construction, production, or purchase of property *with a view to* entering into a sale or exchange of stock by its shareholders or a distribution to it shareholders prior to the realization by the corporation of a substantial part of the net income to be derived from the corporate property.

Taxpayers do not contest the fact that their distributions occurred prior to the corporations' having realized a substantial part of the net income which their operations could reasonably have expected to yield. Nevertheless they urge that the "view" to which the statute addresses itself was not meant to include distributions arising in the context of normal corporate operations, for, as they put it, "such a view is shared by nearly all corporations and their shareholders."

■ The short answer to this argument is that the statute does not qualify the "prohibited view" along the lines which plaintiffs suggest. While a distri-

redemptions and partial liquidations. Under § 115(i), the term partial liquidation meant a "distribution by a corporation in complete cancellation or redemption of a part of its stock * * *." 53 Stat. 48

(1939). It would appear, therefore, that the partial stock redemption would fit as comfortably within the "sale in liquidation" language of § 117(m) as it does within the "or otherwise" language.

bution bearing tax avoidance implications would clearly come within the scope of the statute, so also would the distributions here in issue. The rule obtains that, where "Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." Barr v. United States, 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945). In Braunstein v. Commissioner, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963), the Supreme Court emphatically rejected the notion that section 117 (m) be held to have application only in those instances where judicial evaluation might prove the existence of tax avoidance considerations. It stated:

> * * * There is no indication whatever of any congressional desire to have the Commissioner or the courts make a determination in each case as to whether the use of the corporation was for tax avoidance. Indeed, the drawing of certain arbitrary lines not here involved—such as making the section inapplicable to any shareholder owning 10% or less of the stock or to any gain realized more than three years after the completion of construction—tends to refute any such indication. It is our understanding, in other words, that Congress intended to define what it believed to be a tax avoidance device rather than to leave the presence or absence of tax avoidance elements for decision on a case-to-case basis.
>
> [374 U.S. at 71, 83 S.Ct. at 1666.]

■ With these considerations in mind, we believe that the trial commissioner was quite correct in finding that plaintiffs shared the necessary "view." His conclusion in this regard was premised upon their concession that they, like other real estate investors, contemplated that the corporations would be operated so as to produce "cash flow" from the *earliest* possible time and that such cash flow would be distributed to the stockholders. To this little need be added, save perhaps to point out their concession

wholly comports with the requisite that we declared in Tibbals v. United States, 362 F.2d 266, 276, 176 Ct.Cl. 196, 215 (1966). It was there stated "that the view to sale [or a distribution] contemplated by section 117 (m) must have existed *before completion* of the construction work for which the corporation was formed." There can be little question that, in this case, it was intended from the inception of the venture to effect distributions as soon as possible. And that such distributions would therefore occur prior to the point of substantial corporate income realization is a conclusion which the nature of the business itself compels.

■ But taxpayers contend that more need be shown than simply their proven intent (framed before completion of construction) to participate in a distribution that arises prior to the corporation's having realized a substantial portion of its expected income. They urge that the "view" issue embraces not merely a question of "when" it arose, but also a question of "why" it arose. It is their position that the "view" toward distribution must have been accompanied or induced by the *then* existing awareness that the distribution would occur before the corporation had realized a substantial portion of its future net income. Stated otherwise, the contention being made is that the absence of "substantial income realization" must be found to be the motivating factor in any decision leading up to a distribution (or a "sale or exchange"). Here, we are told, such motivation was lacking.

While we recognize its persuasive force, nevertheless, this argument rests, in the last analysis, upon the premise that, where tax avoidance considerations are subjectively nonexistent, the application of section 117 (m) should be rejected. Braunstein v. Commissioner, supra, compels otherwise. "[T]he statute applies when the requisite factors coalesce despite an absence of tax avoidance purposes." Maliner v. United States, 362 F.2d 281, 283, 176 Ct.Cl. 144, 148 (1966).

Inasmuch as plaintiffs received their distributions prior to the time that the corporations had earned a substantial portion of their net incomes and inasmuch as plaintiffs intended from the outset to effectuate such distributions, we find the view requirement to be satisfied. In light of this, the distributions received were correctly taxed as ordinary income. The petition is dismissed.