**Arthur P. and Teresa POMPONIO, Husband and Wife, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 8212.

United States Court of Appeals Fourth Circuit.

Argued Jan. 12, 1961.

Decided March 28, 1961.

Frederick R. Tansill, Washington, D. C. (Goodwin, Rosenbaum, Meacham & White, Washington, D. C., on brief), for petitioners.

David O. Walter, Attorney, Department of Justice, Washington, D. C. (Abbott M. Sellers, Acting Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attorneys, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOPER and HAYNSWORTH, Circuit Judges, and FIELD, District Judge.

HAYNSWORTH, Circuit Judge.

The taxpayer, Arthur Pomponio, received his pro rata part of substantial cash distributions made to their stockholders by corporations which had constructed and were operating housing projects. The distributed cash was generated by borrowed funds and rental receipts. The distributions were made during years when the corporations had yet to realize substantial net income from their operations.

The taxpayer allocated a small part of his receipts to dividends and reported them as such. The remainder, he treated as a return of capital. Since this portion of his receipts far exceeded the basis of his stock, he treated the excess as long term capital gain. Deficiencies for the years involved were assessed by the Com-

missioner upon the theory that the corporations were collapsible within the meaning of § 117(m) of the 1939 Code,[1] and that these distributions were ordinary income rather than long term capital gain. The Tax Court agreed with the Commissioner,[2] and the taxpayers brought this petition to review the decision of the Tax Court.

In September 1948, Arthur Pomponio and, one, William Bornstein, organized a Virginia corporation known as Donna Lee Corporation. Each of them paid in $500, for which he received fifty shares of no par common stock. Donna Lee purchased a parcel of land with certain improvements thereon, the total purchase price of $145,000 being allocated, $110,289.35 to the land and $34,710.65 to the improvements. Thereafter, Donna Lee constructed rental housing units upon the land at an additional cost of $2,122,058.13, so that the total cost of land, improvements, buildings, equipment, and furnishings was $2,267,058.13. These improvements were financed by loans aggregating $2,360,800.[3]

Donna Lee had gross rental income in the years 1949 through 1953 of approximately $40,000, $300,000, $323,000, $332,000, and $335,000, respectively. After charging depreciation on the declining balance method, it showed a net loss for 1949 of $20,378.58. In 1950, 1951 and 1952, it showed net operating income of $3,854.81, $11,345.71 and $687.10, respectively, but it paid no actual income taxes in those years because of the loss carried forward from 1949. In 1953, it showed a net loss of $3,873.55.

Donna Lee distributed to its stockholders in cash $100,000 in 1949, $65,500 in 1950, $46,900 in 1951, and $46,800 in 1952. Arthur Pomponio, the owner of fifty per cent of the stock, received half of each of these distributions. Of the $50,000 he received in 1949, he reported

$500 as the recovery of the basis of his stock, and the remaining $49,500 as long term capital gain. Of the $79,600 he received in the years 1950–1952, he reported $7,952.80 as dividends and $71,647.20 as long term capital gains.

In May 1948, the taxpayer, together with Louis Pomponio and Arthur Hirsch, organized a Virginia corporation known as Greenbrier Apartments, Inc. The stockholders transferred five lots of land to Greenbrier in exchange for 900 shares of common stock issued in equal proportions to the three stockholders. The taxpayer's cost basis of his interest in the land transferred, which became the basis of the 300 shares of stock he received, was $8,333.33.

Greenbrier constructed certain rental housing units at a total cost of land, improvements, buildings, equipment, and furnishings of $865,300.53. This construction was financed by an FHA loan of $894,600. Greenbrier had rental income in the years 1949–1952 in the approximate sums of $15,000, $117,000, $114,000, and $118,000, respectively. It had operating profits in 1950–1951, which were offset by losses carried forward from previous years, and a very small operating loss in 1952.

In 1950, Greenbrier distributed in cash to its stockholders approximately $42,685, and in 1952, $3,900. Of the $14,228.44 received by the taxpayer from Greenbrier in 1950, he allocated $2,719.78 to dividends, $8,333.33 to the recovery of his basis, and $3,175.33 as long term capital gains. He reported as long term capital gains all of the $1,300 he received from Greenbrier in 1952.

Deficiencies were assessed for the years 1950, 1951 and 1952 on the basis of the Commissioner's contention that all of the distributions by Donna Lee and Greenbrier during those years were taxable to the recipient stockholders as

1. 26 U.S.C.A. (1939 Code) § 117(m).

2. 33 T.C. 1072.

3. Applications for FHA insurance on these loans had been approved and the Tax Court found that these mortgage loans were actually insured by FHA The taxpayer says that while the loans had been approved by FHA for insurance, they were actually consummated without such insurance.

ordinary income. It was this determination of the Commissioner that the Tax Court sustained because of the provisions of § 117(m) of the 1939 Code.

We have had a succession of cases in which we were concerned with the tax treatment of withdrawals by stockholders from overly financed corporations constructing and operating housing projects,[4] when the withdrawals were made before substantial net income from operations had been realized. The taxpayer, here, seeks to distinguish those cases upon the ground that, since the stockholders here surrendered none of their stock in connection with any of the distributions, there was no "sale or exchange" within the meaning of § 117(m). He points to the fact that paragraph (1) of § 117(m) applied only to "gain from the sale or exchange * * * of stock of a collapsible corporation * * *." He says that, since the stockholders did not sell their stock, did not surrender any part of it for redemption or cancellation, and are still the owners of all of the shares in each corporation initially issued

to them, there has been no transaction within the reach of § 117(m).[5]

It is true that when § 117(m) was enacted, the attention of the Congress was focused upon more sophisticated schemes by which stockholders sought capital gains treatment of unrealized, prospective corporate earnings through liquidations, stock sales, the redemption of one class of stock, or a disproportionate redemption of a single class of stock. The language of paragraph (1) of § 117(m) is thus expressly directed to these more sophisticated devices clearly cast in the form of a sale or exchange in order to buttress the claim to capital gain treatment. It does not follow, however, that § 117(m) does not reach the less complicated devices by which anticipated corporate profits are distributed to the stockholders. Indeed, in paragraph (2) of § 117(m), in defining the "view" with which a collapsible corporation must be availed in order to bring the transaction within § 117(m), specific reference is made to distributions to shareholders as well as to sales or exchanges of stock.

4. Burge v. Commissioner, 4 Cir., 253 F.2d 765; Spangler v. Commissioner, 4 Cir., 278 F.2d 665; Bryan v. Commissioner, 4 Cir., 281 F.2d 238.

5. Paragraphs (1) and (2) of § 117(m) are as follows:

"(1) Treatment of gain to shareholders. Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions.

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property.

"(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

"(i) it engaged in the manufacture, construction, or production of such property to any extent,

"(ii) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manfactured, constructed, produced, or purchased the property, or

"(iii) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation."

Though the regulations under § 117 (m) were not promulgated until 1953, the Commissioner then interpreted that Section as applying whether or not there was any formal redemption of stock in connection with the distribution. This principally appears from subparagraph (a) and example (1) of subparagraph (e).[6] The taxpayer suggests that the regulations were an afterthought of the Commissioner, since the Commissioner learned after the adoption of § 117(m) of transactions cast in the form of those here. He finds comfort in the fact that § 341(a) of the 1954 Code specifically refers to distributions by collapsible corporations, without reference to a sale, transfer, or redemption of stock, much in the language of the Commissioner's regulations in 1953 under § 117(m) of the 1939 Code.

We think that the distributions here come within § 117(m) of the 1939 Code. To the extent that they were not dividends, taxable as such, they are distributions of excess cash in the nature of distributions in partial liquidation, the gain from which is required by § 115 to be treated as gain from a sale or exchange. In light of the specific reference in paragraph (2) of § 117(m) to such distributions, and construing §§ 117(m) and 115 together, we think that there was here a sale or exchange within the meaning of paragraph (1) of § 117(m).

The distinction the taxpayer seeks to draw is too formalistic. He concedes that if, in connection with each distribution, the stockholders had surrendered a proportion of their stock, the distributions would clearly be taxable under § 117(m). In that event, the profiting stockholders would have continued after each transaction to own all of the outstanding stock of the corporation,[7] and in the same proportions. The substance of what they did was not in the least affected whether or not they went through the form of a surrender of a portion of their stock upon their receipt of their proportionate part of each cash distribution.

As was said by Judge Parker, speaking for this Court, in Burge v. Commissioner, 4 Cir., 253 F.2d 765, 767, 769:

"* * * The word 'collapsible' considered apart from its context would be somewhat misleading; but there can be no question, we think, as to what Congress meant by a 'collapsible corporation' as used in the statute. That term was used to describe a corporation which is made use of to give the appearance of a long term investment to what is in reality a mere venture or project in manufacture, production or construction of property, with the view of making the gains from the venture or project taxable, not as ordinary income, as they should be taxed, but as long term capital gains. Because the basic type of transaction which gave rise to the legislation involved the use of temporary corporations which were dissolved and their proceeds distributed after tax avoidance had been accomplished, the term 'collapsible corporation' was employed to describe the corporations used for this form of tax avoidance; but the statute was drawn in broad general terms to reach the abuse which had arisen, whatever form it might take.

* * * * *

"Kindred arguments are made to the effect that the distribution to Class B stock was not from the sale of stock but from the excess of the construction loan and was not attributable to the construction of the property; but this is a mere grasping at straws. The statute covers distribution to shareholders as well as sales or exchanges of stock; and if the liquidation of the Class B stock did not result from a sale to

---

6. Treasury Regulations 111, § 29.117–11; T.D. 5999, 1953–1, Cum.Bul. 187, 189.

7. With the exception of the preferred stock, having an aggregate par value of $100, issued to FHA by Greenbrier.

and purchase of the stock by the corporation, which was the form in which the transaction was cast, it was certainly 'a distribution to its shareholders'. It is objected that the distribution was made in cash and not in 'property'; but nothing in the statute requires that the distribution be in property and, as this case well illustrates, the evil at which the legislation was directed could inhere in a cash distribution as well as in a distribution of property. * * * "

It is true that the transaction in Burge was cast in the form of a stock redemption, but the reasoning and the language of the Court was so applicable to cash distributions without a formal pro rata redemption of stock that the Court of Appeals for the Second Circuit relied upon it in Glickman v. Commissioner, 2 Cir., 256 F.2d 108, when it specifically held § 117(m) applicable to cash distributions of this sort without a formal redemption, transfer or cancellation of any stock. It expressed its conclusion with a brief reference to Burge without extended discussion. The Glickman case has been followed by two other cases in the Court of Appeals for the Second Circuit,[8] in each of which § 117(m) was held to apply to cash distributions without any formal redemption or exchange of stock. Each of those cases involved distributions precisely like those with which we are concerned here.

In the cases in the Court of Appeals for the Second Circuit, that Court was principally concerned with other contentions. The fact that in neither of the opinions in those three cases it discussed at length the particular distinction the taxpayer here seeks to draw, does not indicate that the suggested distinction received less consideration than it merited. It suggests, instead, that the distinction is not one of substance.

We agree with the Court of Appeals for the Second Circuit. Though the tax-

payer and his fellow-stockholders neglected to go through the meaningless form of surrendering a proportion of their stock upon receipt of each cash distribution, the effect of the transaction in each instance was the same as if they had. The gains they derived were gains from sales or exchanges within the meaning of § 117(m), and the Tax Court properly sustained the Commissioner in treating such gains as ordinary income for tax purposes.

Affirmed.

---

8. Sidney v. Commissioner, 2 Cir., 273 F.2d 928; Mintz v. Commissioner, 2 Cir., 284 F. 2d 554.