Collins, Judge,
delivered the opinion of the court:
In this suit, plaintiffs seek refund of Federal income taxes for the years 1950-53. The controversy focuses upon section 117 (m) of the Internal Revenue Code of 1939[1] — more familiarly recognized as the “collapsible corporation” provisions.[2] This section, first introduced into the Internal Revenue Code in 1950, was designed to prevent use of the corporate form as a means of escaping ordinary income treatment through the guise of accelerated capital gains. The issue here is whether the Commissioner of Internal Revenue was correct in claiming that section 117 (m) required plaintiffs to treat as ordinary income, rather than as capital gain, certain corporate distributions received by them.
The case was originally submitted to our trial commissioner on a stipulated set of facts. It was his recommendation that plaintiffs should prevail. However, we are of the persuasion that the issue, while not without its difficulties, must be resolved in the Government’s favor. The relevant facts are as follows:
During the taxable years in question, plaintiffs were minority stockholders in seven corporations, each of which owned and operated its own rental housing unit. Six of these corporations, respectively designated as Queenstown Apartments A, B, C, D, E, and G, were formed in 1947 and 1948; the seventh corporation, which owned and operated an apartment unit known as the Berkshire, was organized in 1949. Operating with mortgage financing insured by the Federal Housing Administration, each corporation, upon its formation, undertook the construction of an apartment house. The Queenstown Apartments — a multi-unit garden-type project — saw the completion of its last section (i.e., section G) in August 1949; Berkshire, a high-rise apartment building, was completed in 1950.
*578 Corporate capitalization consisted, in each instance, of 100 shares of preferred stock ($1 par value), issued to the Federal Housing Administration, and 500 shares of Class B common stock (without par value), issued to its regular shareholders. Plaintiffs, each of whom acquired his or her interest in 1950, held, as individuals, from 1 to 6 percent of the total stock of the seven corporations. Collectively, they held a 29-percent interest in the seven corporations.
Within 8 years after the respective dates of completed construction, each of the seven corporations made cash distributions to its Class B shareholders in amounts proportionate to its shareholders’ respective interests. The source of these distributions was the rental income realized by the corporations from their normal business operations.[3]
Plaintiffs filed their income tax returns for the calendar years 1950,1951,1952, and 1953, reporting the cash distributions which they had received as capital gains to the extent that such distributions exceeded the costs of their stock. Deficiencies were assessed against each plaintiff on the ground that the Queenstown and Berkshire corporations were “collapsible corporations” within the meaning of section 117 (m) of the Internal Revenue Code of 1939 and that the gain from such distributions should be taxed at ordinary income rates. The assessments were paid as shown in the detailed findings, claims for refund were made and disallowed, and this suit followed.
Plaintiffs concede that, to the extent that the distributions were made out of earnings and profits, their gain is properly characterized as ordinary income. However, as to the greater portion of each distribution, which admittedly was not out of earnings and profits, plaintiffs contend that this should be accorded preferential capital gains treatment.
Their argument for this result is threefold. First, it is contended that section 117 (m) applies only to gain from a sale or exchange and does not apply to nonliquidating distributions. In support of this argument, plaintiffs look to the words of section 117 which reads, in relevant part, as follows:
*579 (xn) Collapsible CORPORATIONS.—
(1) TREATMENT OE GAIN TO SHAREHOLDERS. — Gain from, the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset. [Emphasis supplied.1 [64 Stat. 934.]
Plaintiffs point to the fact that their gains (i.e., the distributions received) did not derive from a sale or exchange, either in liquidation or otherwise, but were simply non-liquidating distributions stemming from the corporations’ rental income. And since, in this case, these distributions exceeded (for the most part) not only the distributing corporations’ earnings and profits, but also plaintiffs’ bases for their stock, they contend that all amounts in excess of bases should be accorded capital gain treatment, as provided in section 115(d).[4]
The sticking point in this argument, and that which robs it of much of its persuasiveness, is the fact that section 117 (m) condemns to ordinary income status not only the gain which might result from a sale or exchange, but also the gain resulting from a corporation’s distributions to its shareholders.
Section 117 (m), in its definitional paragraph (subpart 2), provides:[5]
(A) For the purposes of this subsection, the term “collapsible corporation” means a corporation formed *580 or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to-
Sthe sale or exchange of stock by its shareholders ¡ther in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, * * * [Emphasis supplied.]
Considered in light of the above, section 117 (m) would seem quite clearly to include within its scope the presently considered distributions. And it would follow from this, that, if the statute’s other requisites be satisfied, plaintiffs were properly required to treat their gains as ordinary income.
To overcome this conclusion, plaintiffs offer their second contention. They argue that the “distribution” referred to above (section 117(m) (2) (A)'(i)) speaks not to a distribution of cash, but rather to a distribution of the property which the collapsible corporation either had manufactured, constructed, or produced. For proof of this position, we are referred to the relevant legislative history.[6]
Typical of the views expressed on this point are those set forth by the Senate’s Committee on Finance.[7] Its report states, in part, with respect to the proposed section on “Treatment of Gains to Shareholders of Collapsible Corporations,” the following:
This section of the bill adds a new subsection (m), relating to collapsible corporations, to section 117 of the code. The collapsible corporation is a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long-term capital gain taxable only at a rate of 25 percent.
*581 Under paragraph. (1) of the subsection as added to the code, gain from the sale or exchange of stock of a collapsible corporation will be treated as gain from the sale or exchange of property which is not a capital asset. This treatment is to be effective, however, only to the extent that the use of the device is interpreted as giving rise to gain which gain is considered (but for the provisions of the subsection) as long-term capital gain.
$ $ $ $ ‡
* * * The corporation, furthermore, has been so defined as to describe corporations different in kind from those which ordinarily liquidate following normal business operations. This objective has been specifically strengthened by the statement made in subparagraph, (i) above, to the effect that the sale or exchange or the distribution be made prior to the realization by the corporation of a substantial part of the net income to be derived from the property. Although in many cases an ordinary corporation may distribute property in kind in the course of its liquidation, or the stock in such a corporation may be sold prior to the realization by the corporation of the net income to be derived from some of its property, such a corporation could not be considered to have been formed or availed of principally for the manufacture, construction, or production of that property alone.
_ While the primary use made of collapsible corporations in the past has usually involved their liquidation in the manner indicated above, it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation by selling their stock to outside interests at the time and under the circumstances when the corporation might otherwise be liquidated. In Wee manner, the corf oration might distribute the property in question without liquidating cmd, under section lid (d), the value of the property distributed, to the extent that it was not a dividend, would first be applied against the adjusted basis of the stoeh to the shareholders and the excess, if any, would be taxable in the same manner as a gam from the sale or exchange of property. Pa/ragraph (1) of the subsection, in prescribing the treatment to be given the gain from the sale or exchange of stoeh of a collapsible corporation, is deemed to refer to this excess value In the case of a distribution made by the corporation other than in *582 liquidation. Such a distribution is specifically referred to in connection with the definition of the term “collapsible corporation” in paragraph (2) of the subsection. Both paragraph (1) and paragraph (2) of the subsection refer to a sale or exchange of the stock other than in liquidation. . [Emphasis supplied.].
In light of the above, there can be little question that Congress, in its use of the term “distribution,” clearly meant to include gams deriving from a distribution of property, irrespective of whether such distribution occurred m the context of a formal liquidation. In other words, even though there be no sale or exchange of stock, either in liquidation or otherwise, section 117 (m) remains operative. But to read the term “distribution,” as plaintiffs urge, so as to limit its applicability only to those situations where there is a distribution of property (as opposed to a distribution of cash) would not only impart to the statute a limitation which it does not contain, but would also result in attributing to Congress a singular shortsightedness.
It is a foregone conclusion that if, in this case, plaintiffs were to have received their cash distributions pursuant to a pro rata redemption of part of their stock, that transaction would have been viewed as a “sale,”[8] and, as such, would fall squarely within the operative language of section 117 (m), i.e., “gain from the sale or exchange (whether in liquidation or otherwise) of stock * * [9] (Emphasis supplied.)
And if, in this context, a cash distribution must yield to ordinary income treatment, then surely the same result obtains where cash is received without the attendant formalities *583 of a partial stock surrender. We can see no meaningful distinction, insofar as the application of section lit (m) is concerned, between a shareholder’s obtaining his cash through a partial stock redemption as opposed to the more direct reach into the corporate pocketbook which the cash distribution affords. After a pro rata redemption, the participating shareholders would own precisely the same interests in the corporate property and in the same proportions; they would stand in the same relation as would those stockholders who drew out the corporation’s cash by means of a direct distribution. The two transactions are alike in all respects save their label.
These considerations, coupled with Congress’ clearly expressed intent to include within the catalog of condemned devices a distribution which did not involve the sale or exchange of stock, persuade us that the “distribution” thus referred to in section 117 (m) encompasses cash as well as other property. Like conclusions were reached in Pomponio v. Commissioner, 288 F. 2d 827 (4th Cir. 1961); Glickman v. Commissioner, 256 F. 2d 108 (2d Cir. 1958); and Burge v. Commissioner, 253 F. 2d 765, 769 (4th Cir. 1958). Indeed, any other view would result in ascribing to Congress the unique position of recognizing (for section 117 (m) purposes) the equivalency between a sale or exchange and a distribution, on the one hand, while meting out differing tax consequences with the other. The statute should not be read in such an unbalanced fashion.
With respect to the argument that a distribution of property effects a corporate contraction, while the cash distribution here described would not, this does not spell out a meaningful distinction. It might well be true that the abuses which figured most prominently in the legislative mind were those involving the “temporary” corporation (with liquidation or partial contraction following shortly after formation) , but the statute does not require that the elements of a contraction be present before its provisions become operative. Relevant case law does not support a contrary vieAV. See Mintz v. Commissioner, 284 F. 2d 554 (2d Cir. 1960); Glickman v. Commissioner, supra.
We come then to the final point which plaintiffs have *584 raised. They contend that, regardless of our construction of the statute, its application would not be warranted because of the absence here of the prohibited “view.”
To qualify as a collapsible corporation under section 117(m), a corporation must have been formed or availed of for the manufacture, construction, production, or purchase of property with a view to entering into a sale or exchange of stock by its shareholders or a distribution to its shareholders prior to the realization by the corporation of a substantial part of the net income to be derived from the corporate property.
Taxpayers do not contest the fact that their distributions occurred prior to the corporations’ having realized a substantial part of the net income which their operations could reasonably have expected to yield. Nevertheless, they urge that the “view” to which the statute addresses itself was not meant to include distributions arising in the context of normal corporate operations, for, as they put it, “such a view is shared by nearly all corporations and their shareholders.”
The short answer to this argument is that the statute does not qualify the “prohibited view” along the lines which plaintiffs suggest. While a distribution bearing tax avoidance implications would clearly come within the scope of the statute, so also would the distributions here in issue. The rule obtains- that, where “Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators.” Barr v. United States, 324 U.S. 83, 90 (1945). In Braunstein v. Commissioner, 374 U.S. 65 (1963), the Supreme Court emphatically rejected the notion that section 117 (m) be held to have application only in those instances where judicial evaluation might prove the existence of tax avoidance considerations. It stated:
* * * There is no indication whatever of any congressional desire to have the Commissioner or the courts make a determination in each case as to whether the use of the corporation was for tax avoidance. Indeed, the drawing of certain arbitrary lines not here involved— such as making the section inapplicable to any shareholder owning 10% or less of -the stock or to any gain *585 realized more than three years after the completion of construction — tends to refute any such indication. It is our understanding, in other words, that Congress intended to define what it believed to be a tax avoidance device rather than to leave the presence or absence of tax. avoidance elements for decision on a case-to-case basis.
[374 U.S. at 71.]
With these considerations in mind, we believe that the trial commissioner was quite correct in finding that plaintiffs shared the necessary “view.” His conclusion in this regard was premised upon their concession that they, like other real estate investors, contemplated that the corporations would be operated so as to produce “cash flow” from the earliest possible time and that such cash flow would be distributed to the stockholders. To this little need be added, save perhaps to point out their concession wholly comports with the requisite that we declared in Tibbals v. United States, 176 Ct. Cl. 196, 215, 362 F. 2d 266, 276 (1966). It was there stated “that the view to sale [or a distribution] contemplated by section 117 (m) must have existed before completion of the construction work for which the corporation was formed.” There can be little question that, in this case, it was intended from the inception of the venture to effect distributions as soon as possible. And that such distributions would therefore occur prior to the point of substantial corporate income realization is a conclusion which the nature of the business itself compels.
But taxpayers contend that more need be shown than simply their proven intent (framed before completion of construction) to participate in a distribution that arises prior to the corporation’s having realized a substantial portion of its expected income. They urge that the “view” issue embraces not merely a question of “when” it arose, but also a question of “why” it arose. It is their position that the “view” toward distribution must have been accompanied or induced by the then existing awareness that the distribution would occur before the corporation had realized a substantial portion of its future net income. Stated otherwise, the contention being made is that the absence of “substantial income realization” must be found to be the motivating *586 factor in any decision leading up to a distribution (or a “sale or exchange”). Here, we are told, such motivation was lacking.
While we recognize its persuasive force, nevertheless, this argument rests, in the last analysis, upon the premise that, where tax avoidance considerations are subjectively nonexistent, the application of section 117 (m) should be rejected. Braunstein v. Commissioner, supra, compels otherwise. “[T]he statute applies when the requisite factors coalesce despite an absence of tax avoidance purposes.” Maliner v. United States, 176 Ct. Cl. 144, 148, 362 F. 2d 281, 283 (1966).
Inasmuch as plaintiffs received their distributions prior to the time that the corporations had earned a substantial portion of their net incomes and inasmuch as plaintiffs intended from the outset to effectuate such distributions, we find the view requirement to be satisfied. In light of this, the distributions received were correctly taxed as ordinary income. The petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:

Queenstown Distributions

1. Queenstown Apartments, Section A, Inc. (hereinafter referred to as “Section A”), Queenstown Apartments, Section B, Inc. (hereinafter referred to as “Section B”), Queens-town Apartments, Section C, Inc. (hereinafter referred to as “Section C”), Queenstown Apartments, Section D, Inc. (hereinafter referred to as “Section D”), Queenstown Apartments, Section E, Inc. (hereinafter referred to as “Section E”), and Queenstown Apartments, Section G, Inc. (hereinafter referred to as “Section G”), were incorporated under Maryland law on March 26,1947, July 22,1947, June 9,1948, January 7,1948, November 24,1947 and September 22,1948, respectively, for the purpose of owning and operating a rental housing project in Prince Georges County, Maryland. The issued and outstanding capital stock of each of the Queenstown corporations consisted of 100 shares of preferred *587 stock of a par value of $1 each, and 500 sb.ar,es of Class B common stock without par value. For convenience, the above corporations are hereinafter referred to collectively as the “Queenstown corporations”.
2. During the calendar years 1950 through 1952, inclusive, each of the plaintiffs owned the number of shares of the issued and outstanding Class B common stock of each of the Queens-town corporations set forth below. The percentage of ownership of the shares of such Class B common stock owned by each plaintiff to the total number of such outstanding shares and the amount of money paid to each of the Queens-town corporations upon the original issuance of such shares is also set forth below.

The 100 shares of preferred stock of each of the Queenstown corporations were issued to the Federal Housing Administration for $100 cash.
3. Each of the Queenstown corporations constructed a separate section of a multi-unit garden-type apartment project under mortgage financing which was insured by the Federal Housing Administration pursuant to section 608 of the National Housing Act, as amended, 12 TJ.S.C. § 1743 (1964). The entire apartment project, known as the Queenstown Apartments, contains approximately 1,050 apartment units, and is located on Queens Chapel Road, Mt. Rainier, Maryland, an area adjacent to the northeast section of Washington, D.C. Construction on the separate sections commenced at various times during 1947 and 1948.
*588 4. (a) Section A completed the construction of its separate section of the apartment project on March 1, 1948. During the 3-year period commencing on the date of the completion of such construction, Section A made the following cash distributions to its common stockholders:
Date of Distribution: Amount
March 1, 1950_$20,000.00
July 20, 1950_ 17,703.00
September 19, 1950- 5, 301.45
December 21, 1950- 6,000.00
The above distributions made by Section A to its common stockholders in its taxable year ended February 28, 1951 totaled $49,004.45, of which $750.90 was made out of Section A’s current or accumulated earnings and profits.
(b) Section B completed the construction of its separate section of the apartment project on September 1,1948. During the 3-year period commencing on the date of the completion of such construction, Section B made the following cash distributions to its common stockholders:
Date of Distribution: Amount
March 1, 1950_$26,910.00
July 20, 1950_ 17,142.22
September 19, 1950_ 4,303. 53
December 21, 1950_ 6, 000. 00
May 21, 1951_ 1,000.00
With respect to the above distributions made by Section B to its common stockholders in its fiscal year ended February 28,1951 and its fiscal year ended December 31,1951, the following table sets forth the total amount of such distributions during such periods and the amounts of such distributions which were made out of Section B’s current or accumulated earnings and profits:

For the taxable period ending December 31,1951, Section B’s total cash distributions to common stockholders and the *589 amounts of its current and accumulated earnings and profits were $9,000 and $4,575.21, respectively. The above computations were based upon the proportionate amount of the total current and accumulated earnings and profits allocable to the $1,000 distribution made within the 3-year period commencing on the date of completion of construction.
(c) Section C completed the construction of its separate section of the apartment project on May 1,1949. During the 3-year period commencing on the date of the completion of such construction, Section C made the following cash distributions to its common stockholders:
Date of Distribution: Amount
March 1, 1950_$24, 000. 00
July 20, 1950_ 37, 688.22
September 19, 1950_ 7,796.25
December 21, 1950_ 7,000. 00
May 21, 1951_ 5,000.00
September 5,1951_ 8, 000.00
December 18, 1951_11,000.00
April 28, 1952 _ 2, 000. 00
With respect to the above distributions made by Section C to its common stockholders in its fiscal year ended February 28,1951, its fiscal year ended December 31,1951 and its calendar year ended December 31, 1952, the following table sets forth the total amount of such distributions during such periods and the amounts of such distributions which were made out of Section C’s current or accumulated earnings and profits:

For the taxable period ended December 31,1952, Section C’s total cash distributions to common stockholders and the amounts of its current and accumulated earnings and profits were $11,000 and $7,582.74, respectively. The above computations were based upon the proportionate amount of the *590 total current and accumulated earnings and profits allocable to the $2,000 distribution made within the 3-year period commencing on the date of completion of construction.
(d) Section D completed the construction of its separate section of the apartment project on February 1,1949. During the 3-year period commencing on the date of the completion of such construction, Section D made the following cash distributions to its common stockholders :
Date of Distribution: Amount
March 1, 1950_ $8, 500. 00
July 20, 1950_ 64', 222.98
September 19, 1950. 3,679. 83
December 21, 1950-4,000.00
May 21, 1951_ 1, 000. 00
September 5, 1951-3, 000.00
December 18, 1951 . 9,000. 00
With respect to the above distributions made by Section D to its common stockholders in its fiscal year ended February 28,1951 and its fiscal year ended December 31, 1951, the following table sets forth the total amount of such distributions during such periods and the amounts of such distributions which were made out of Section D’s current or accumulated earnings and profits: '

(e) Section E completed the construction of its separate section of the apartment project on December 1, 1948. During the 3-year period commencing on the date of the completion of such construction, Section E made the following cash distributions to its common stockholders:
Date of Distribution: Amount
March 1, 1950_$12, 000.00
July 20, 1950_ 8, 635. 00
September 19, 1950_^_ 3, 866. 94
December 21, 1950_ 5, 000.00
May 21, 1951_ 1, 000. 00
September 5, 1951_ 3,000. 00
*591 With respect to the above distributions made by Section B to its common stockholders in its fiscal year ended February 28, 1951 and its fiscal year ended December 31,1951, the following table sets forth the total amount of such distributions during such periods and the amounts of such distributions which were made out of Section E’s current or accumulated earnings and profits:

For the taxable period ended December 31,1951, Section E’s total cash distributions to common stockholders and the amounts of its current and accumulated earnings and profits were $9,000 and $2,440.82, respectively. The above computations were based upon the proportionate amount of the total current and accumulated earnings and profits allocable to the $4,000 distribution made within the 3-year period commencing on the date of completion of construction.
(f) Section G completed the construction of its separate section of the apartment project on August 1,1949. During the 3-year period commencing on the date of the completion of such construction, Section G made the following cash distributions to its common stockholders:
Date of Distribution: Amount
■March 1, 1950_$16, 000
July 20, 1950- 44,236
September 19, 1950_ 5, 052
May 21, 1951_ 1, 000
September 5, 1951_ 5, 000
December 18, 1951_ 5, 000
April 28, 1952_ 2, 000
With respect to the above distributions made by Section G to its common stockholders in its fiscal year ended February 28,1951, its fiscal year ended December 31,1951 and its calendar year ended December 31, 1952, the following table sets forth the total amount of such distributions during such periods and the amounts of such distributions which were *592 made out of Section G’s current or accumulated earnings and profits:

For the taxable period ended December 31, 1952, Section G’s total cash, distributions to common stockholders and the amounts of its current and accumulated earnings and profits were $8,000 and $3,301.40, respectively. The above computations were based upon the proportionate amount of the total current and accumulated earnings and profits allocable to the $2,000 distribution made within the 3-year period commencing on the date of completion of construction.
(g) The cash distributions made by the Queenstown corporations during the calendar years 1950 through 1952, inclusive, as set forth in subparagraphs (a) through (f) above, were, in each case, made to the Class B common stockholders in proportion to their respective stock ownership. Each of the plaintiffs received his or her proportionate share of such cash distributions. Each of the plaintiffs acquired his or her Class B common stock of each of the Queenstown corporations in 1948 or 1949 and had owned such common stock for more than 6 months prior to the receipts of the said cash distributions. Each of the plaintiffs continued to own his or her shares of Class B common stock of each of the Queenstown corporations until 1960 when such stock was sold, in conjunction with a sale of all Class B common stock by all of the shareholders, to an unrelated purchaser.
(h) At the dates of the distributions referred to in sub-paragraphs (a) through (f) above, all of the Queenstown cbrporations had deficits in earnings and profits accumulated after February 28, 1913, except for Section B which at the beginning of its fiscal year ended February 28, 1951, had $12,007.09 of earnings and profits accumulated after February 28,1913. All of the Queenstown corporations had cur *593 rent earnings and profits for the fiscal periods ending February 28,1951,, December 31,1951 and December 31,1952, to the extent set forth in subparagraphs (a) through (f) above.
5. (a) With respect to each of the Queenstown corporations, the amounts, as shown by the books and records of each corporation, of the proceeds received by such corporation from its FHA-insured permanent mortgage loan and the amount expended for (i) the construction of improvements, (ii) interest on the construction loan, and (iii) the cost of land and other carrying charges not included in the foregoing, are as follows:

The amounts of construction loan interest were withheld by the respective mortgage lenders from the periodic advances made during construction and were not actually received by the borrowers. The books and records of the corporations and the records of the FHA indicate that most, if not all, of the land acquisition costs and other carrying charges were, in each case, paid prior to the completion of construction of the project.
(b) In the case of Section A, rentals of apartment units began on or about April 15,1948. Advances totaling $266,229 were made by the construction lender for Section A after April 15, 1948. Between April 15, 1948 and May 28, 1948, the date when the final construction advance was made, Section A did not receive any net rentals from tenants (i.e., gross rental receipts less operating expenses and mortgage amortization) .
(c) In the case of Section B, rentals of apartment units began on or about September 1, 1948. Advances totaling *594 $146,677 were made by the construction, lender for Section B after September 1, 1948. Between September 1, 1948 and November 2, 1948, the date when the final construction advance was made, Section B had received net rentals from tenants (i.e., gross rental receipts less operating expenses and mortgage amortization) of approximately $80,000.
(d) In the case of Section C, rentals of apartment units began on or about May 1,1949. Advances totaling $408,324 were made by the construction lender for Section C after May 1,1949. Between May 1,1949 and August 8, 1949, the date when the final construction advance was made, Section C had received net rentals from tenants (i.e., gross rental receipts less operating expenses and mortgage amortization) of approximately $22,500.
(e) In the case of Section D, rentals of apartment units began on or about February 1, 1949. Advances totaling $828,243.81 were made by the construction lender for Section D after February 1, 1949. Between February 1, 1949 and June 22, 1949, the date when the final construction advance was made, Section D had received net rentals from tenants (i.e., gross rental receipts less operating expenses and mortgage amortization) of approximately $38,500.
(f) In the case of Section E, rentals of apartment units began on or about December 1, 1948. Advances totaling $163,153.28 were made by the construction lender for Section E after December 1, 1948. Between December 1, 1948 and December 29, 1948, the date when the final construction advance was made, Section E had received net rentals from tenants (i.e., gross rental receipts less operating expenses and mortgage amortization) of approximately $12,000.
(g) In the case of Section G, rentals of apartment units began on or about August 1,1949. Advances totaling $211,-442.59 were made by the construction lender for Section G after August 1, 1949. Between August 1, 1949 and October 14, 1949, the date when the final construction advance was made, Section G had received net rentals from tenants (i.e., gross rental receipts less operating expenses and mortgage amortization) of approximately $12,100.
6. During the period from completion of each separate section of the apartment project through December 31,1952, *595 each of the Queenstown corporations realized rental income (less refunds), sustained depreciation deductions (computed on the straight-line method) and made mortgage principal amortization payments as follows:

7. Throughout the period in which the plaintiffs were stockholders of the Queenstown corporations, they intended that each of the Queenstown corporations would be operated in the normal manner for a corporation which owned an FHA-insured apartment project, that is, that rental income would be collected from tenants and to the extent that cash funds from rentals, mortgage proceeds, or otherwise, remained after payment of the costs of construction, land, organization and operating expenses, and amortization of the mortgage indebtedness, such cash funds would be available for distribution to the stockholders.

Berkshire Distributions

8. The Berkshire, Inc. (hereinafter referred to as “Berkshire”) was incorporated under Delaware law on April 18, 1949, for the purpose of owning and operating a rental housing project in Washington, D.C. The issued and outstanding capital stock of Berkshire initially consisted of 100 shares of preferred stock with a par value of $1 each and 500 shares of common stock without par value.
9. During the calendar years 1952 and 1953, each of the plaintiffs owned the number of shares of the issued and outstanding common stock of Berkshire set forth below. The percentage of ownership of the shares of such common stock owned by each plaintiff to the total number of such outstand *596 ing shares and the amount of money paid to Berkshire upon the original issuance of such shares is also set forth below.

The 100 shares of preferred stock of Berkshire were issued to the Federal Housing Administration for $100 cash.
10. Berkshire constructed a high-rise apartment building under mortgage financing which was insured by the Federal Housing Administration pursuant to section 608 of the National Housing Act. The building is located on Massachusetts Avenue in the northwest section of Washington, D.C. Construction of the building commenced in 1949 and was completed in December 1950.
11. (a) During the calendar years 1952 and 1953 and within the 3-year period commencing on the date of the completion of construction, Berkshire made cash distributions to its common stockholders in the total amounts of $150,000 and $202,000, respectively. During each of the years 1952 and 1953, Berkshire had a deficit in earnings and profits accumulated after February 28, 1913, but had current earnings and profits in the amounts of $106,449.75 for 1952 and $62,798.57 for 1953.
(b) The cash distributions made by Berkshire during the calendar years 1952 and 1953, as set forth in subparagraph (a) above, were, in each case, made to the common stockholders in proportion to their respective stock ownership. Each of the plaintiffs received his or her proportionate share of such distributions. Each of the plaintiffs acquired his or her common stock of Berkshire in 1950 and had owned such common stock for more than 6 months prior to the receipts of *597 said cash distributions. Each, of the plaintiffs continued to own such common stock until December 1,1961, when Berkshire was completely liquidated and its assets distributed to its stockholders in complete cancellation and redemption of their stock.
12. After Berkshire had commenced construction on its high-rise apartment building, it was discovered that the total cost of construction would exceed the amount of mortgage financing available for the project. As a result, during construction Berkshire borrowed $135,000 directly from its stockholders and $243,655.10 from 4201 Mass. Ave., Inc., a corporation in which several of its stockholders were interested. As of February 28,1951, Berkshire issued at par 2,435 shares of its second preferred stock, par value $100 per share, to 4201 Mass. Ave., Inc. and 957 shares of its second preferred stock to its common stockholders in partial satisfaction of the amounts advanced by those parties during the construction period. The remaining balance of $39,300 owed to the common stockholders was paid by Berkshire in the latter part of 1951. Berkshire’s FHA-insured mortgage loan was in the amount of $6,761,000, while the total construction cost for its high-rise apartment building, as shown by its books and records, was $6,945,026.23. The above mortgage loan included construction loan interest of $118,280.50 which was withheld by the lender and not actually received by the borrower.
13. During the period from the completion of its high-rise apartment project through December 31, 1953, Berkshire received rentals from tenants (which constituted its principal source of income) of $3,274,477.66, sustained depreciation deductions (computed on the straight-line method) of $727,713.23, and made mortgage principal amortization payments of $292,087.82.
14. Throughout the period in which the plaintiffs were stockholders of the Berkshire, they intended that Berkshire would be operated in the normal manner for a corporation which owned an FHA-insured apartment project, that is, that rental income would be collected from tenants and to the extent that cash funds from rentals, mortgage proceeds, or otherwise, remained after payment of the costs of construe *598 tion, land, organization and operating expenses and amortization of the mortgage indebtedness, such cash, funds would be available for distribution to the stockholders.

General

15. (a) Plaintiffs Aaron Goldman and Cecile S. Goldman are husband and wife residing in the District of Columbia. For the calendar years 1950,1951,1952 and 1953, Aaron and Cecile Goldman filed joint federal income tax returns. On their federal income tax returns for those years, Aaron and Cecile Goldman reported certain distributions received by them from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Revenue assessed deficiencies against Aaron and Cecile Goldman for 1950,1951,1952 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117(m) of the Internal Revenue Code of 1939, and that the distributions received by them from those corporations during 1950-1953 were taxable as ordinary income.
(b)The assessments against Aaron and Cecile Goldman for the years 1950-1953 were satisfied by payment on June 8,1959, of tax and interest as follows:

(c) On September 18, 1960, Aaron and Cecile Goldman filed timely claims for the refund of the taxes and interest paid for the years 1950-1953.
(d) By certified letter dated March 21,1961, the Commissioner notified Aaron and Cecile Goldman that their claims for refund for 1950-1953 were disallowed.'
*599 16. (a) Plaintiffs Balfour Goldman and Doris B. Goldman are husband and wife residing in Bethesda, Maryland. For the calendar years 1950, 1951, 1952 and 1953, Balfour and Doris Goldman filed joint federal income tax returns. On their federal income tax returns for those years, Balfour and Doris Goldman reported certain distributions received by them from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Bevenue assessed deficiencies against Balfour and Doris Goldman for 1950, 1951, 1952 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Bevenue Code of 1939, and that the distributions received by them from those corporations during 1950-1953 were taxable as ordinary income.
(b)The assessments against Balfour and Doris Goldman for the years 1950-1953 were satisfied by payment on June 8,1959 of tax and interest as follows:

(c) On September 18, 1960, Balfour and Doris Goldman filed timely claims for the refund of the taxes and interest paid for the years 1950-1953.
(d) By certified letter dated March 23,1961, the Commissioner notified Balfour and Doris Goldman that their claims for refund for 1950-1953 were disallowed.
17. (a) Plaintiffs Hymen Goldman and Yetta D. Goldman are husband and wife residing in the District of Columbia. For the calendar years 1950,1951 and 1953, Hymen and Yetta Goldman filed joint federal income tax returns. On their federal income tax returns for those years, Hymen and Yetta Goldman reported certain distributions received by them *600 from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Revenue assessed deficiencies against Hymen and Yetta Goldman for 1950, 1951 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Revenue Code of 1939, and that the distributions received by them from those corporations during 1950, 1951 and 1953 were taxable as ordinary income. The said deficiencies were also attributable, in part, to other adjustments which are not contested herein.
(b)The assessments against Hymen and Yetta Goldman for the years 1950, 1951 and 1953 were satisfied by payment or credit on June 22, 1959, of tax, penalty and interest, as follows:

(c) On September 19, 1960, Hyman and Yetta Goldman filed timely claims for the refund of taxes, penalty and interest paid for the years 1950,1951 and 1953.
(d) By certified letter dated April 17, 1961, the Commissioner notified Hyman and Yetta Goldman that their claims for refund for 1950,1951 and 1953 were disallowed.
18. (a) Plaintiffs Nathan Goldman and Minette Goldman are husband and wife residing in Bethesda, Maryland. For the calendar years 1950,1951,1952 and 1953, Nathan and Minette Goldman filed joint federal income tax returns. On their federal income tax returns for those years, Nathan and Minette Goldman reported certain distributions received by them from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Revenue assessed deficiencies against Nathan and Minette Goldman for 1950,1951,1952 and 1953, on the theory that the Queens- *601 town corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Eevenue Code of 1939, and that the distributions received by them from those corporations during 1950-1953 were taxable as ordinary income. The said deficiencies were also attributable, in part, to other adjustments which are not contested herein.
(b)The assessments against Nathan and Minette Goldman for the years 1950-1953 were satisfied by payment on June 8,1959, of tax, penalties and interest, as follows:

(c) On September 19,1960, Nathan and Minette Goldman filed timely claims for the refund of the taxes, penalties and interest paid for the years 1950-1953.
(d) By certified letter dated March 23,1961, the Commissioner notified Nathan and Minette Goldman that their claims for refund for 1950-1953 were disallowed.
19. (a) Plaintiff Anne Gelfand is an individual residing in the District of Columbia. For the calendar years 1950, 1951, 1952 and 1953, Anne Gelfand filed individual federal income tax returns. On her federal income tax returns for those years, Anne Gelfand reported certain distributions received by her from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Eevenue assessed deficiencies against Anne Gelfand for 1950, 1951, 1952 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Eevenue Code of 1939, and that the distributions received by her from those *602 corporations during 1950-1953 were taxable as ordinary income.
(b)The assessments against Anne Gelfand for the years 1950-1953 were satisfied by payment on June 22,1959, of tax, penalties and interest as follows:

(c) On September 19, 1960, Anne Gelfand filed timely claims for the refund of the taxes, penalties and interest paid for the years 1950-1953.
(d) By certified letter dated March 23,1961, the Commissioner notified Anne Gelfand that her claims for refund for 1950-1953 were disallowed.
20. (a) Plaintiff Herbert Gelfand is an individual residing in the District of Columbia. For the calendar years 1950, 1951.1952 and 1953, Herbert Gelfand filed individual federal income tax returns. On his federal income tax returns for those years, Herbert Gelfand reported certain distributions received by him from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Bevenue assessed deficiencies against Herbert Gelfand for 1950.1951.1952 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Revenue Code of 1939, and that the distributions received by him from those corporations during 1950-1953 were taxable as ordinary income. The said deficiencies were also attributable, in part, to other adjustments which are not contested herein.
(b) The assessments against Herbert Gelfand for the years *603 1950-1953 were satisfied by payment on June 22,1959, of tax, penalties and interest, as follows:

(c) On September 19, 1960, Herbert Gelfand filed timely claims for the refund of the taxes, penalties and interest paid for the years 1950-1953.
(d) By certified letter dated March 23,1961, the Commissioner notified Herbert Gelfand that his claims for refund for 1950-1953 were disallowed.
21. (a) Plaintiffs Meyer Gelfand and Vesta M. Gelfand are husband and wife residing in the District of Columbia. For the calendar years 1950 and 1951, Meyer Gelfand filed individual federal income tax returns and for the calendar years 1952 and 1953, Meyer Gelfand and Vesta M. Gelfand filed joint federal income tax returns. On his federal income tax returns for 1950 and 1951, Meyer Gelfand reported certain distributions received by him from the Queenstown corporations and Berkshire as capital gain. On their federal income tax returns for 1952 and 1953, Meyer and Vesta Gel-fand reported certain distributions received by them from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Revenue assessed deficiencies against Meyer Gelfand for 1950 and 1951, and against Meyer and Vesta Gelfand for 1952 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Revenue Code of 1939, and that the distributions received by them from those corporations during 1950-1953 were taxable as ordinary income.
*604 (b)The assessments against Meyer Gelfand for the years 1950 and 1951, and against Meyer and Yesta Gelfand for the years 1952 and 1953, were satisfied by payment on June 23, 1959 of tax and interest, as follows:

(c) On September 19, 1960, Meyer Gelfand filed timely claims for the refund of the taxes and interest paid for the years 1950 and 1951. On September 19, 1960, Meyer and Vesta Gelfand filed timely claims for the refund of the taxes and interest paid for the years 1952 and 1953.
(d) By certified letter dated March 28,1961, the Commissioner notified Meyer Gelfand that his claims for refund for 1950 and 1951 were disallowed.
(e) By certified letter dated March 23,1961, the Commissioner notified Meyer and Yesta Gelfand that their claims for refund for 1952 and 1953 were disallowed.
22. (a) Plaintiff Sarah Gelfand is an individual residing in the District of Columbia. For the calendar years 1950, 1951 and 1953, Sarah Gelfand and her husband, Harry Gel-fand, who died .on February 8, 1960, filed joint federal income tax returns. Plaintiffs Meyer Gelfand and Herbert M. Gelfand are the duly qualified, appointed and acting Executors of the Estate of Harry Gelfand, deceased. On their federal income tax returns for 1950, 1951, and 1953, Harry and Sarah Gelfand reported certain distributions received by them from the Queenstown corporations and Berkshire as capital gain. The Commissioner of Internal Bevenue assessed deficiencies against Harry and Sarah Gelfand for 1950, 1951 and 1953, on the theory that the Queenstown corporations and Berkshire were “collapsible corporations” within the meaning of section 117 (m) of the Internal Bevenue Code of 1939, and that the distributions received by them from *605 those corporations during 1950, 1951 and 1953 were taxable as ordinary income. The said deficiencies were also attributable, in part, to other adjustments which are not contested herein.
(b)The assessments against Harry and Sarah Gelfand for the years 1950 and 1953 were satisfied by payment on June 22, 1959, and the assessment for 1951 was satisfied by payment or credit on July 2,1959, of tax, penalty and interest, as follows:

(c) On September 19, 1960, Sarah Gelfand and Meyer and Herbert M. Gelfand, Executors of the Estate of Harry Gelfand, filed timely claims for the refund of the taxes, penalty and interest paid for the years 1950, 1951 and 1953.
(d) By certified letter dated March 21,1961, the Commissioner notified Sarah Gelfand and the executors of the Estate of Harry Gelfand that their claims for refund for 1950, 1951 and 1953 were disallowed.
23. (a) Plaintiffs Hymen Goldman and Yetta D. Goldman filed joint federal income tax returns for the calendar years 1952 and 1954 and paid the tax shown to be due on such returns. By separate letters dated January 13, 1959, Robert C. Park, Associate Chief, Appellate Division, Internal Revenue Service, notified plaintiffs Hymen and Yetta D. Goldman of tentative overassessments in their federal income tax for the calendar years 1952 and 1954 in the amounts of $136.70 and $150.50, respectively.
(b) On June 15, 1959, Hymen and Yetta Goldman filed timely claims for refund of the tentative overassessments for the years 1952 and 1954. The parties are agreed that this proceeding shall not prejudice whatever rights, if any, Hymen and Yetta D. Goldman may have with respect to the said tentative overassessments.
*606 24. (a) Harry and Sarah. Gelfand filed a joint federal income tax return for the calendar year 1952 and paid the tax shown to be due on such return. By a letter dated January 13,1949, Eobert C. Park, Associate Chief, Appellate Division, Internal Eevenue Service, notified Harry and Sarah Gelfand of a tentative overassessment in their federal income tax for the calendar year 1952 in the amount of $355.33.
(b) On June 15, 1959, Harry and Sarah Gelfand filed timely claims for refund of the tentative overassessment for the year 1952. The parties are agreed that this proceeding shall not prejudice whatever rights, if any, Sarah Gelfand and the executors of the Estate of Harry Gelfand may have with respect to the said tentative overassessment.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed.

 unless otherwise noted, all references herein shall be to the Internal Revenue Code of 1939.

 Int Rev. Code of 1939, § 117 (m), added by ch. 994, § 212(a), 64i Stat. 934 (1950), as amended, ch. 521, § 326, 65 Stat. 502 (1951) (now Int. Rev. Code of 1954, § 341, as amended).

 In the case of two of the Queenstown corporations, the distributions also included a small portion of excess mortgage funds.

 Int. Rev. Code of 1939, § 115(d), 53 Stat. 47, amended by ch. 247, § 214(b), 53 Stat. 873, provides as follows:
"(d) Other Distributions From Capital. — If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1), is not treated as a dividend, whether or not otherwise a dividend.”

 As quoted above, § 117 (m) reflects the amendments introduced by way of the Revenue Act of 1951, ch. 521, § 326, 65 Stat. 502. Prior to this change, § 117 (m) (2) (A) did not reach those corporations whose “collapsible” property was acquired through purchase.

 H.R. Rep. No. 2S19, 81st Cong., 2d Sess. 96 (1950-2 Cum. Bull,. 380, 449) ; S. Rep. No. 2375, 81st Cong., 2d Sess. 88 (1950-2 Com. Boli,. 483, 546). See also 1950-2 U.S. Code Cong. Service 3099, 3145, 3232.

 S. Rep. No. 2375, 81st Cong., 2d Sess., 1950-2 U.S. Code Cong. Service, supra at 3145, 3146.

 under ordinary circumstances, a distribution received pursuant to a partial redemption would result in ordinary income to the recipient. However, that result would not obtain here (in the absence of § 117 (m)) because the lack of earnings and profits would bring the distribution within the prescribed capital gain treatment specified by § 115(d). The transaction would therefore be deemed a sale rather than a distribution essentially equivalent to a dividend.

 While our opinion emphasizes the "or otherwise” language of § 117 (m), it should be noted that, prior to 1954, the Internal Revenue Code did not distinguish between redemptions and partial liquidations. Under §115(i), the term partial liquidation meant a “distribution by a corporation in complete cancellation or redemption of a part of its stock * * 53 Stat. 48 (1939). It would appear, therefore, that the partial stock redemption would fit as comfortably within the “sale in liquidation" language of § 117 (m) as it does within the “or otherwise” language.